## RICHARDS v. OREGON SHORT LINE RAILROAD COMPANY.

No. 2303. Decided May 11, 1912 (123 Pac. 933).

1. RAILROADS—INJURIES TO STOCK—SUFFICIENCY OF EVIDENCE—NEGLIGENCE. Evidence in an action against a railroad company for killing horses on the track *held* not to sustain a finding that defendant's engineer was negligent in that he could have seen the horses on the track before they were struck. (Page 108.)

2. NEGLIGENCE—INFERENCE. While negligence may be inferred, there must be some facts from which the inference may be deduced. (Page 109.)

3. NEGLIGENCE—SUFFICIENCY OF EVIDENCE—INFERENTIAL NEGLIGENCE. Inferential evidence of negligence is overcome by defendant's undisputed testimony negativing negligence, so that, if plaintiff's case rests wholly on inferential evidence, the case should be taken from the jury.[1] (Page 109.)

APPEAL from District Court, Second District; *Hon. N. J. Harris*, Judge.

---

[1] Christensen v. Railroad Co., 35 Utah, 137, 99 Pac. 676, 20 L. R. A. (N. S.) 255, 18 Ann. Cas. 1159.

Action by Jesse S. Richards against the Oregon Short Line Railroad Company.

Judgment for plaintiff. Defendant appeals.

REVERSED AND REMANDED FOR NEW TRIAL.

*P. L. Williams, Geo. H. Smith, Frank Nebeker* and *H. B. Thompson* for appellant.

*Richards & Boyd* for respondent.

FRICK, C. J.

Respondent recovered judgment against appellant for damages which he alleged he sustained by the death of two horses which he claimed were killed by appellant through the negligent operation of its locomotive and train of cars. In the complaint, the acts constituting negligence are alleged as follows: That on the 3d day of January, 1910, two certain horses belonging to the plaintiff (respondent) "strayed in and upon the track and ground occupied by the railroad of the said defendant at or near Arimo, in the county of Bannock, state of Idaho; that said defendant, by its agents and servants, not regarding its duty in that regard, so carelessly and negligently ran and managed its locomotive and cars that the same ran against and over the said horses of the said plaintiff and killed and destroyed the same."

From the bill of exceptions it appears that the substance of the evidence adduced at the trial on behalf of respondent tended to show that Arimo is a flag station on appellant's line of railroad in Bannock County, Idaho, at which there are no station buildings, but, at the time of the accident, there was a store known as Henderson's store and a toolhouse, both of which were upon the station grounds. The railroad track runs nearly due north and south through the station grounds, but curves a little to the west about 1200 feet south from the east end of said grounds; that on the night of January 2, 1910, and for some time prior thereto, respondent kept the

two horses aforesaid, with some others, in a field immediately east of the station grounds aforesaid; that said field was inclosed by a wire fence, which was in good order and repair immediately before the accident; that some distance south of the store building and toolhouse aforesaid there was a wire gate through which the horses were taken into and from said field. The west fence of said field was constructed along the east boundary line of appellant's right of way or station grounds. There was a private crossing over the railroad track at the point where the gate was located, immediately south of which were cattle guards. There was also a public road south of the station grounds running north and south, and the station grounds were open and unfenced on the south along said road. There was also a private crossing over the railroad track north of the station grounds near which another cattle guard was located, and beyond which the right of way was fenced. The horses in question were last seen in the field by the man who had them in charge and who fed them on the evening of the 2d day of January, 1910, at about five o'clock. The next morning at about eight o'clock a witness for the respondent who lived near the station grounds testified that he saw the horses lying dead some distance north of the store building and toolhouse beside the main track. The man who fed the horses the evening before also testified that he saw them about nine o'clock that morning lying dead as aforesaid. He also says that one of them was lying about 300 yards north of the crossing at which the gate was placed, and the other one a considerable distance farther north, and they both were lying beside the main track. The two witnesses also testified that near to and a little south of the point where the horses seemed to have been struck there were a few, or, as one of them put it, a "row of cars" standing on a side or passing track, which was immediately east of the main track; that, comparatively speaking, there was no grade for 1200 or 1400 feet south of the store building, and for about a like distance to the north thereof; that the headlight of an engine coming from the south could be seen for more than 1200 feet south of where

the horses seemed to have been struck and killed. The man who had charge of the horses also testified that the gate spoken of was a wire gate; that on the evening of the 2d of January, 1910, when he left the horses, the gate was closed and in good condition; that on the next morning at about nine o'clock he found the wires on the north end of the gate were either cut or broken off smooth, but he could not tell whether they had been cut or broken; that the gate was down and lying somewhat to the side of the opening, and the horses had all escaped from the field. There is no evidence whatever when or how the horses escaped from the field, nor is there any evidence where the horses went after they left the field, except as it is inferred that at least the two that were killed must have gone onto the railroad track at some moment of time before they were struck and killed. Respondent offered no direct evidence that the horses were struck by a moving train, but that fact was inferred from the fact that there was some evidence on and along the track that the horses were struck and killed by the locomotive and train of cars, and further from the injuries and bruises on the horses themselves. It was also made to appear that the night was cold and there was quite considerable snow on the ground. The respondent, in addition to the foregoing, proved the value of the horses, and then rested.

After a motion for nonsuit had been interposed by appellant and denied by the court, the appellant, in substance, produced the following evidence: The engineer testified that he was in charge of a freight train, which was an extra, and which, in approaching the station grounds at Arimo, was running at about twenty miles an hour; that the train was not scheduled to stop nor did he intend to stop at that station; that he approached the station shortly after eleven o'clock on the night of the 2d of January, 1910, and when he had arrived at or near the toolhouse spoken of his train struck some horses; that the night was "foggy and dark and I could not see anything of them (the horses) until I was about seventy feet, or two carlengths, from the horses." He further said that, when he first saw the horses, they were to the

east of the main track, between it and what is called the passing track; that there were a "string of cars," about thirty-five, standing on the passing track, and that these cars prevented him from seeing the horses sooner than he did; that he saw the horses first when he was some distance south of the toolhouse to which we have referred. On cross-examination he said: "I could not say for sure just how close they were to the toolhouse; it was very foggy and dark, and they were standing in the shade of those cars on the passing track." He was also asked by respondent's counsel whether or not he was "using a careful lookout all through there," meaning in passing into and along the station grounds, which he answered in the affirmative. Counsel also asked the engineer what movement, if any, the horses made after he first saw them. He answered: "I thought for an instant they were going to start to run to the west" across the track, "but instead they made a motion to turn to the west and then they turned back towards the cars again." He further says that at about that moment the horses were struck, one of which remained partially on and partially under the pilot of the engine, and which one was carried the farthest north where it was found the next morning by the witness who testified for respondent. The engineer, when pressed further on cross-examination as to how far he could see the horses ahead of the headlight on his train on the night in question, said: "I said on a clear track—I say if there hadn't been anything on the passing track at all the head-light wouldn't have shown more than 100 feet, but, the cars being on the passing track, I could not see these horses until I was about two carlengths away from them—about seventy feet—and I said if the cars hadn't been there I could have seen them 100 feet." The engineer also said that owing to the frost and fog, the track was "slippery;" that he had what is called an acetylene headlight, which was in good condition; and that all the appliances on the train were in good working order.

The brakeman on the train was also called as a witness on behalf of appellant. He testified that in approaching Arimo

station he was in the cab with the engineer and fireman; that the night was foggy and cold; that in approaching the station he observed that the engineer was keeping a lookout ahead by "leaning out of the side of the cab because he couldn't see through the window;" that the reason the engineer could not see out of the front cab window was because the frost had accumulated thereon preventing him from seeing through it, and for that reason he kept a lookout by leaning out of the side window of the cab on the right or east side of the engine. This witness also says that the engine whistle was sounded at the whistling post about a half mile south of the station; that the track then rounds the curve and after that is straight for about 1100 feet immediately south of where the horses were struck. On being asked to describe the collision, the witness said: "Why, just about where we passed this shanty—this little toolhouse—the engineer threw the brakes on and I threw the window open—it is one of the sliding windows—and I threw that window open and seen some horses jumping out on my side, and I hollered to the engineer, and he says, 'I guess we got some horses.' . . . But these horses on my side got away; there was nothing hurt on my side, but there was several got out, I don't know how many." This witness also said that as soon as the engineer saw or became aware of the presence of the horses he applied the emergency brake to stop the train, and then, after having struck the horses, he released the brakes again; that he thought the engineer saw the horses on his side of the cab a moment or so before the witness saw those on the other side; that the horses were struck at about the time he saw those running away on the west side of the engine; that the train was stopped after it had run some distance, and the horse that was partially on and partially off the pilot of the engine was removed by the engineer backing the train, and the other one, which was on the track in the rear of the train, was also removed from the track. The horses were then left by the trainmen lying along the track in the condition in which they were found the next morning by respondent's witnesses as before stated.

Respondent, on rebuttal, produced two witnesses, one of whom testified that up to ten o'clock on the night of the accident there was no fog at Arimo; that he went to bed about that time and was unable to state the condition of the weather after that, but up to that hour the night was clear and the stars were shining, but that it was quite cold, "zero weather or below," as he called it. The other witness testified that about five miles south from Arimo the weather was as described by the first witness up to about midnight or a little thereafter, when he went to bed. There was also considerable expert evidence with regard to the distance an ordinary acetylene headlight will disclose objects as large as a horse on or near the track, and within what distance a train such as the engineer described he had in charge could be stopped with braking appliances such as the train was equipped with. The testimony is to the effect that the longest distance at which an object such as a horse could be seen on a clear starlight night ahead of an approaching train was a half to three-quarters of a mile, and the shortest distance within which a train like the one in question could have been stopped was from 500 to 800 feet.

At the conclusion of the evidence, the appellant requested the court to direct the jury to return a verdict in its favor upon the ground that the evidence failed to establish negligence in operating the train as alleged in the complaint. The court refused to so charge, but, upon respondent's request, charged the jury, among other things:

"That it was the duty of the defendant company, *upon approaching the crossing in question, to keep a reasonable lookout to discover any stock or animals that might be thereon or in close proximity thereto,* and to avoid any injury or the striking of any animals that might, *by the exercise of reasonable care, have been discovered thereon or in such proximity thereto as that it might reasonably have been anticipated might come thereon.* That is, you are instructed in this case that *it was the duty of the engineer, or employees of the defendant company to keep a proper lookout for the horses of the plaintiff, whether they were upon the track or*

*in such close proximity thereto that they might likely run*
*upon or across the track, and, in case of the discovery of the*
*horses thereon or in such proximity to the track, it was the*
*duty of such engineer to use the usual and proper means to*
*frighten them away,* and, failing in this, to check the speed
of his train and bring it under control in order to avoid in-
jury to them. If he failed to do these things, and the in-
juries complained of resulted by reason thereof, the defend-
ant company would be guilty of negligence. Or, even though
you may believe from the evidence that the engineer or em-
ployees of the defendant company *did not discover the horses*
*of the plaintiff upon or in close proximity to these tracks, but*
*that by reasonable and proper lookout they could have done*
*so and thereby have avoided the injury, then the defendant*
*company is liable the same as if they had in fact discovered*
*them in time to have frightened them away."*

Appellant excepted to those portions of the instruction that
are italicized and now insists that the court erred in not di-
recting a verdict in its favor, and also erred in charging the
jury as indicated above. Appellant's counsel strenuously in-
sist that the horses in question were trespassing upon its sta-
tion grounds and tracks, and that therefore the law did not
impose the duty upon it to maintain a lookout for the pur-
pose of discovering them, but the only duty the law imposed
upon it was the exercise of reasonable care not to injure
them after they were discovered at or near the track or in a
place of danger. Assuming, without deciding, for the pur-
poses of this decision, that, as an abstract proposition, the
law is correctly stated in the foregoing instruction, and that
appellant was required to maintain a reasonable vigilance or
lookout for animals that may have come on or near its track
or grounds, yet the question that first must be met under the
facts and circumstances of this case is, Did the undisputed
evidence, when considered most favorably in favor of re-
spondent, justify the submission of the case to the jury?

The undisputed evidence shows that the horses were kept
in a field which was adjoining appellant's station grounds;
that there was a private way across the track which led into

the field and over which the horses were taken or driven into it through a gate; the field was inclosed with a wire fence, and, at the place where the horses were taken into the same, a wire gate was kept for that purpose, and that both the fence and gate were in good condition at about five o'clock on the evening before the accident; that by some means unknown the wires of the gate were either cut or broken some time before the accident, and the horses got out of the field by means of the breaking down of the gate; that they were not on this private crossing when they were struck, but were some 300 feet north of it; that there was a store building, toolhouse, and a few cars (one of the witnesses said a row of cars) standing on what is called a passing track, and that said buildings and cars were all near the place where the horses were struck; that the fence along the west line of the field was along the easterly line of the station grounds; that a public road ran along the southerly line of said grounds; and that by this road access was had to the grounds and buildings aforesaid, while the southerly end of the station grounds was bounded by the private way or crossing aforesaid, and at the northerly end of the grounds was another private crossing, at both of which crossings there were cattle guards, and the right of way was fenced beyond the cattle guards both north and south; that about 1100 or 1200 feet south from the place where the horses were struck the railroad track curved to the west, and that the track is straight for about that distance immediately south of where the collision occurred, and that the track for that distance and through the grounds is practically level. There is no evidence of how the horses got out of the field except as stated above. There is no evidence except the statement of the engineer where the horses were just before they were struck by the engine, and there is absolutely no evidence of how long they were at the place indicated by the engineer, or that they were on or near the track at any time, or that they were at a place where they could have been seen by the engineer at any time before he said he saw thm. Nor did respondent produce any evidence that horses, cattle, or live stock at any time before the accident had strayed or gone onto

the grounds or tracks of appellant even during daytime.
There was nothing, therefore, so far as the evidence dis-
closed, from which appellant's employees were charged with
notice that live stock might be expected to be on or near the
railroad track at the place where the collision occurred, even
in daytime, and much less could they have been charged with
such notice at midnight when they had a right to assume
that horses, like all other animated nature, would seek repose.
It is manifest, therefore, that the appellant cannot be charged
with negligence except in the management of its train in ap-
proaching the place where the horses were struck, and that
such negligence is limited to the distance of about 1100 or
1200 feet after the train had passed around the curve to
which we have referred. Is there any substantial evidence
upon which such negligence may be predicated?

Respondent's counsel vigorously contend that such negli-
gence may be inferred. This leads us to inquire from what
facts such an inference may be deduced. Apart from the
statement of the engineer, it may no doubt be inferred that,
from the fact that the horses were struck and killed, they
were either on the track or in the path of the engine and train
when they were struck. In this way it may also be inferred
that they were in such a position immediately preceding and
at the time of the collision. In view of the evidence in this
case, can it, however, also be inferred that the horses were
on or near the track so that they could have been seen
by the engineer for any length of time before he ac-
tually discovered them? From what facts may such
an inference be deduced? If it may be deduced at all, it
must be from the fact that the horses were struck, and hence
must have been on or near the track, and, if they were so at
one moment of time, it may be inferred that they were in such
a position for at least a reasonable length of time prior there-
to, and hence the engineer could have seen them had he main-
tained a reasonable vigilance or lookout for obstacles on or
near the track. While an inference is undoubtedly sound
that the horses were on or near the track when struck, it does
not at all follow, however, either as a necessary, or even as a

reasonable, result that the horses were on or near the track for any particular length of time before they were struck, or, at least, before they were seen by the engineer. The horses were free to move from place to place, and in view that there was a store building and toolhouse and some cars near the track, all of which, while not directly in the path of the oncoming engine, were yet near to it and near the place where the horses were struck, any one or more of which buildings or cars may have been instrumental in concealing either directly or by its shadow the horses from the view of the engineer, the whole matter of where and when the horses first came within the view of the engineer who was on the engine is left to conjecture, which, either in this or in any other case, cannot rise to the dignity of evidence, much less to that of proof.

No doubt negligence may be inferred, but there must be some fact or facts from which the inference may be deduced. But, assuming that respondent could rely upon the inferences referred to for the purpose of making out a *prima facie* case of negligence, were not those inferences fully met and overthrown by positive and unchallenged evidence produced on behalf of appellant?

If this be true, then this case comes squarely within the rule announced by this court in the case of *Christensen v. Railroad Co.*, 35 Utah, 137, 99 Pac. 676, 20 L. R. A. (N. S.) 255, 18 Ann. Cas. 1159. In that case the rule is stated in the seventh headnote thus:

"Inferential evidence of negligence is overcome by defendant's undisputed testimony showing that there was no negligence; and, where plaintiff's case rests entirely on such inferential evidence, the case must be taken from the jury."

In *Goss v. N. P. Ry. Co.*, 48 Or. 439, 87 Pac. 149, the rule is stated in the following language:

"Where the evidence of negligence is entirely inferential, and the testimony for the defendant is clear and undisputed to the effect that there was no negligence, the plaintiff's case is overcome as a matter of law, and it becomes the duty of the judge to take the case from the jury."

In the case at bar, therefore, the only negligence that is or can be claimed was the negligence of the engineer in not exercising ordinary care in keeping a lookout for these or any other stray horses or animals that might have come on or near the railroad track.

If we therefore assume all of respondent's evidence to be true with respect to the condition of the headlight, and that by its rays the engineer could have seen the horses for a distance of 1100 or 1200 feet, that the night was clear and the stars were shining, but was cold and frosty, we still must infer that the horses were in a place where they could have been seen by the engineer for a sufficient length of time for him to have avoided the collision. If they were not in such a position, the engineer cannot be charged with negligence for not having seen them. The inference that the horses were in a position where they could have been seen by the engineer is squarely met by the positive testimony of both the engineer and the brakeman that the engineer looked and did not see the horses. The brakeman testified that the glass in the front window of the cab in front of the engineer could not be seen through on account of its frosty condition; that the engineer opened the sliding window on the right side of the cab and kept a lookout through it. The engineer, on cross-examination, also said that he maintained a lookout on the night of the accident on approaching the place where the horses were struck, and that he did not see them until he was within seventy feet of them. The fact that he also said he could not have seen them for other reasons is of course not controlling, since we must judge him by respondent's evidence, but, even though he be judged by that evidence, still his and the brakeman's positive testimony that he maintained a lookout but did not see the horses stands uncontradicted either by direct evidence or facts. If there had been no cars and no buildings of any kind which might have screened the horses from the view of the engineer, there would at least be something upon which to base an inference that the engineer did not look, since, if he had, and there being no obstacles in the way to have prevented him from seeing the horses, he should

have seen them. The most that can be said, therefore, is that appellant's negligence rests upon a weak and most unsatisfactory inference which practically amounts to no more than a mere conjecture. This inference was met, however, by undisputed evidence on behalf of appellant. Under such circumstances, the court should have directed a verdict for the appellant.

In addition to the cases already referred to, we also refer to the following which will be found to be directly in point: *Georgia, etc., Ry. v. Sanders,* 111 Ga. 128, 36 S. E. 458; *Georgia, etc., Ry. v. Thompson,* 111 Ga. 731, 36 S. E. 945; *Central El. Ry. Co. v. Wood,* 105 Ga. 499, 30 S. E. 933; *Alabama, etc., Ry. v. Stacey* (Miss.), 35 South. 137; *Felton v. Anderson* (Ky.), 66 S. W. 182; *Chicago, etc., Ry. v. Huggins,* 4 Ind. T. 194, 69 S. W. 845.

We are clearly of the opinion, therefore, that, under the uncontradicted evidence, the appellant was entitled to a directed verdict in its favor, and that the refusal of the court to direct such a verdict upon appellant's request requires a reversal of the judgment.

The judgment is therefore reversed, and the cause remanded to the district court, with directions to grant a new trial and to proceed with the case in accordance with the views herein expressed. Appellant to recover costs.

McCARTY, J., concurs.

STRAUP, J.

I concur. I, too, think the evidence is insufficient to support the verdict, not on the theory that the plaintiff had proved facts from which just and reasonable inferences may be deduced showing negligence and that such inferences were overcome or destroyed by positive and direct evidence of no negligence, but that the plaintiff failed to show negligence either by direct or indirect evidence. I do not concur in the principle so broadly stated that just and reasonable inferences showing negligence deduced from proven facts are, in all cases, overcome or destroyed by positive and direct evi-

dence of no negligence, for there are instances where indirect evidence or inferences of negligence may have as much probative weight and effect as positive and direct evidence of no negligence. The case of *Christensen v. Railroad*, 35 Utah, 137, 99 Pac. 676, 20 L. R. A. (N. S.) 255, 18 Ann. Cas. 1159, was not decided on the theory that the plaintiff had sufficiently proved a case of negligence, by inferences or indirect evidence, and that such inferences were overcome or destroyed by positive and direct evidence of no negligence, but that the plaintiff had wholly failed to show, either by direct or indirect evidence, any negligence in the management of the train, or any fault or defect in the condition or construction of the coach door, and that the charged negligence could not be inferred from the mere happening of the accident and injury.