## In re YOWELL'S ESTATE.
## YOWELL et al. v. OGDEN STATE BANK.

No. 4839.   Decided January 31, 1930.   (285 P. 285.)

*E. J. L. Taber,* of Elko, Nev., and *De Vine, Howell, Stine, & Gwilliam,* of Ogden, for appellants.

*Henderson & Johnson, Derrah B. Van Dyke, Joseph Chez* and *Samuel C. Powell,* all of Ogden, for respondent.

ELIAS HANSEN, J.

This appeal involves the validity of what by our statute is called an "olographic will," and the validity of two so-

called codicils. The contestants claim that neither the will nor either of the codicils is in the handwriting of the purported testator, but that all are forgeries. They further claim that, though it be found that the will and the codicils were written by the purported testator, nevertheless the will is invalid because the whole of it is not in the handwriting of the alleged testator, and hence was not executed in compliance with the statute requiring such a will to be entirely written, dated, and signed by the hand of the testator. The case was tried to the court without a jury. Findings and conclusions were made that the will proper was in the handwriting of the alleged testator, and that the printed matter contained on the paper upon which the will was written was not a part of the will. A judgment was rendered accordingly, admitting to probate as the last will and testament of John W. Yowell, deceased, only the portion of the instrument thus found to be in his handwriting. From that judgment the contestants have prosecuted this appeal. They claim that the findings and conclusions are not supported by sufficient competent evidence; that the will was a forgery; that the will indisputably was not wholly in the handwriting of the alleged testator; that the court erred in finding and regarding the printed portion of the instrument as not being a part of the will, and thus erred in admitting the will to probate.

The alleged testator, John W. Yowell, for more than twenty-five years lived at or near Elko, Nev., where prior to his death he owned a cattle and horse ranch. For eight or nine years he conducted a general merchandise business at Elko, Nev. He owned the real estate and buildings upon and in which the business was carried on, together with other real estate. He was a capable and successful business man. He was never married. He had no relatives in either Nevada or Utah. In about 1921 or 1922 he sold out his business at Elko and retired. At about that time he came to Ogden, Utah, and shortly thereafter took rooms with a Mrs. Evelyn C. Miller, who was running a rooming house at Ogden. He

continued to reside at the rooming house of Mrs. Miller, except for visits made by him to Elko and Virginia, until his death, which occurred in Ogden at the rooming house of Mrs. Miller in March, 1927. He paid his room rent promptly each month by checks payable to Mrs. Miller, drawn on an account which he had at the Ogden State Bank. When he died he had on deposit in a checking and in a savings account in the Ogden State Bank $14,971. He also then owned an estate at Elko consisting of money in a bank and real estate amounting to about $35,000. The exact age of the deceased when he died is not shown, but those who knew him placed his age at between seventy-five and eighty years. He left surviving him as his heirs at law a number of nephews and nieces residing in Virginia. Two of them, a nephew and a niece on July 5, 1927, filed a petition in the district court of Weber county, Utah, asking that the Ogden State Bank be appointed administrator of the estate.

Shortly after the death of the deceased, the bank received from Mrs. Miller the key to his safety deposit box at the bank. The box was opened in the presence of Mrs. Miller and her attorney and others. Papers and stocks of different kind were found in the box. No sealed envelopes or other documents were found in the box with reference to a will or other disposition of any property of the deceased. At that time Mrs. Miller made no statement or claim with respect to a will, or that she had any interest whatever in or to the estate of the deceased. It was two or three months thereafter, and several days after the bank had been appointed administrator of the estate, that Mrs. Miller delivered to the bank three sets of keys which were to the deceased's personal effects in his room in the house of Mrs. Miller. She had the keys in her own safety deposit box in the bank and took them out of the box and handed them to the bank at its request. The keys, when handed to the bank, were in three small, sealed letter-size envelopes. Some of the keys were to boxes, drawers, and a trunk in the room occupied by the deceased. When the trunk was

opened, there was found, among other things, a tin box locked with a small padlock. When the tin box was opened, there was found in it, among other things, a large sealed envelope, referred to as Exhibit E. There was no writing on this envelope except the name of "J. W. Yowell" stamped on it by a rubber stamp. In this envelope was a smaller sealed envelope addressed to Mrs. Evelyn C. Miller, and in that was a still smaller sealed envelope also addressed to Mrs. Miller, and in that was found what is claimed to be the will. In the large envelope, Exhibit E, was also found another smaller sealed envelope addressed to the Ogden State Bank and in that two smaller sealed envelopes, one addressed to the bank and the other to A. P. Bigelow, an officer of the bank. In one of these envelopes was found what is claimed to be one of the codicils, and in the other envelope another so-called codicil.

After these documents had been found, the Ogden State Bank, on July 15, 1927, petitioned the district court of Weber county to admit to probate the purported will and for issuance to it of letters testamentary. In the petition it is alleged that the estate of John W. Yowell in Utah consisted of $14,795.71, moneys in the Ogden State Bank, and of other property in the state of Nevada consisting of more than $31,000; that by the terms of the will and codicils, the deceased had indicated an intention that the Ogden State Bank act as executor of the estate. About twenty-three nephews and nieces of the deceased, whose names and addresses are set up in the petition, were alleged to be the only surviving heirs of the deceased, and Evelyn C. Miller as the only devisee or legatee of the will, to whom the whole of the moneys on deposit in the Ogden State Bank had been bequeathed. The heirs appeared and contested the admission of the will to probate, and, among other things, alleged that the purported will and codicils were not in the handwriting of the deceased, but were forgeries, and that the whole of the will was not in the handwriting of the deceased.

The purported will is an unusual document. It was writ-

ten on one of the printed bills used by the deceased when he was in business at Elko. The printed billhead itself is as follows:

J. W. Yowell
Dealer in
General Merchandise.

Terms: Cash.  Crockery, Hardware, Etc.  Elko, Nevada

Interest charged on All ———————— 19———

    Accounts Past Due  M ——————————

Claims on Account of This Invoice must be made within 5 Days after statement is Rendered.  (Red)  ——————————

| Date | Description | (Blue) | Charges | Credits | Balance |
|------|-------------|--------|---------|---------|---------|
|      |             |        |         |         |         |
|      |             |        |         |         |         |

Pasted on the billhead, under the words, "J. W. Yowell," and over the words, "Dealer in General Merchandise, Crockery, Hardware, etc.," appears a printed stanza which reads as follows:

"Farewell.

"Farewell! —but whenever you welcome the hour That awakens the night-song of mirth in your bower Then think of the friend who once welcomed it too And forgot his own griefs to be happy with you *all*"

The word "all" at the end of the stanza was written by the same person who wrote the will. To the left of the printed stanza and on the billhead were written the words "My Tribute" in black ink, and under the stanza and on blank lines on the billhead were written the words, "To Mrs. Evelyn C. Miller, 2563 Adams Ave., Ogden, Utah." The blank date line on the billhead was filled in by writing in black ink "Nov. 15th" and using and adopting the figures "19—" and in writing adding the figures "24," thus making the date November 15, 1924. In the upper right-hand corner of the billhead were written in red ink these words:

"Please Mrs. Miller put 10,000
              or
              9,000 of this to drawing int. in Ogden State Bank for 5 yr."

Below all this and underneath the blue lines on the billhead were written what is claimed to be the body of the will. The whole document thus is as follows:

The words "in fee simple" were written in red ink; the rest of the body of the will was written in black ink.

One of the so-called codicils was also written on one of the billheads of the deceased. It is as follows:

The other so-called codicil is in the handwriting of some one. It is written on two sides of one sheet of paper, and is as follows:

On the top of the right-hand corner of the writing was stamped in red ink by a rubber stamp the name "J. W. Yowell."

The proponents of the will called three witnesses who qualified and testified as handwriting experts.

A. P. Bigelow testified that he is the president of the Ogden State Bank; that he has been engaged in the banking business since 1886, during all of which time he has made a study of handwriting; that he has testified as an expert on handwriting in three or four cases tried in the courts; that he has been acquainted with John W. Yowell since 1923; that he has done business with Mr. Yowell at the bank; that a short time before the death of Mr. Yowell, pursuant to request, he went to see Mr. Yowell at the rooming house of Mrs. Miller.

J. Percy Goddard testified that he resides at Salt Lake City, Utah; that he is a public accountant and examiner of questioned documents and handwriting; that he has made a study of questioned documents and handwriting in connection with his work as public accountant since 1914; that on numerous occasions during the last twelve or thirteen years he has testified in state and federal courts as a handwriting expert; that he has made a study of several authors on handwriting, among them Ames on Forgeries, Austin, Questioned Documents, Abbey on Classification of Handwriting, an English work written by Mitchell, and some four or five other works on handwriting.

J. W. Edmunds testified that he resides at Salt Lake City, Utah; that he has been a certified public accountant for nineteen years and has been engaged in the work of an accountant for more than thirty-five years; that, while engaged as an accountant, he has made a study of handwriting; that upon hundreds of occasions he has been called upon to determine questions of disputed handwriting; that he has testified in court as a handwriting expert probably more than fifty or sixty times.

The witnesses, Mr. Bigelow, Mr. Goddard, and Mr. Edmunds testified that from a comparison of the writings of the will and of the codicils with the handwriting of checks admittedly issued and signed by Mr. Yowell and drawn on the Ogden State Bank, some payable to himself, some to

Mrs. Miller, and some to others, they were of the opinion that the will and codicils were written by the same person who wrote and signed the checks. The principal reasons given by them in arriving at such opinions were, as testified to by them, similarities of certain capital and small letters and figures found in the writings, the size, spacing, slanting, and ending of certain letters and in some instances of pen liftings. None of them testified as to knowledge of or familiarity with the handwriting of the deceased.

Another witness called by the proponents testified that in the winter of 1925 and 1926 he had a conversation with the deceased in his room; that the witness stated to Mr. Yowell that Mrs. Miller had "quite a hard game like anyone as taking roomers and trying to make a go of it with a house this size and property and an overhead," that Mrs. Miller was worrying about it; that the deceased replied, "Well, well, she wont have to worry about anything of that kind after I am gone," and said, "This is my home, been the only home I have had," and passed it off that way. The witness further testified "that the deceased was a very hardheaded man, very hardheaded, and exceptionally bright."

Another witness, a maid of Mrs. Miller, testified that on February 22, 1927, she was cleaning the deceased's room when Mrs. Miller and the deceased were in the room; that Mrs. Miller assisted him to and from the bathroom; that, as the deceased walked in the room, he said, "Wait a minute I want to show you two something"; that he then took two envelopes out of a drawer of the library table and said, "In these envelopes are three keys which I have sealed and kept sealed; I wish you to hold them, Mrs. Miller, until they are needed;" that he put them back in the drawer, and said, "We will leave these here until I am dead, after that, you take them." She further testified that Mrs. Miller asked the deceased if she should send for some of his folks, and that he replied, "No, they can't do me any good;" that Mrs. Miller asked him if he "had provisions made for your affairs

or for your people"; and that he replied, "I have papers made; now let us not talk about it any more."

Another witness called by the proponents testified that in July or August, 1926, after the deceased had returned from a visit to the East, "to see some of his folks," the witness stated to him that he supposed the deceased would go back there to live, and that the deceased replied: "Never, all these people out there want is money. They want me to loan them money and I won't do it. All they want is money, money all the time."

Another witness testified that about six weeks before the death of the deceased the witness asked him if he did not want to let his folks know about his condition, and that the deceased replied that he did not. The foregoing is, in substance, the evidence adduced by the proponents in support of the will and of the codicils.

The contestants called three witnesses who qualified and testified as handwriting experts. Hayden Henderson testified that he has been engaged in the banking business at Elko, Nev., for a little more than thirty-one years; that he is the cashier of the Henderson Banking Company; that he has been acquainted with John W. Yowell since 1896; that Mr. Yowell was engaged in raising cattle and in the mercantile business at Elko; that the deceased was a man of affairs and quite extensively interested in Elko; that during all of that period the deceased did business with the banking institution with which the witness was connected; that in his business dealings the deceased consulted with the bank and with different attorneys at Elko; that he kept his papers in a box in a large safety deposit box at the bank; that he never knew the deceased to quote poetry, or to attend church, or to use any religious expressions, such as "God bless you," or "Amen"; that the deceased was a capable business man, and that he, as administrator, of a rather large estate at Elko, properly and successfully administered it; that the bank had a number of letters from the deceased and did considerable business with and for him; that the

witness was well acquainted and familiar with and knew the handwriting of the deceased. The witness identified a number of writings and documents written by the deceased, and testified that they were written by him. He also testified that he had examined the purported will and codicils; that from his knowledge of and familiarity with the handwriting of the deceased neither the will nor the codicils were in his handwriting; that such writings were not "anything like anything I have ever seen from John W. Yowell"; that the deceased was not in the habit of making papers of such character, with things plastered on them and written partly in red and partly in black ink, and making marginal references with circles around them; that it was the custom of the deceased in important transactions and matters to discuss them with the bank and with an attorney and have an attorney draw his papers. The witness compared the purported will and codicils with documents admittedly in the handwriting of the deceased. In his opinion the will and codicils were not in the handwriting of the deceased.

William Kennett testified that for nearly four years he was the bookkeeper of the deceased at Elko; that the deceased was a very shrewd business man; that he kept all of his important papers in a safety deposit box in the bank at Elko; that he consulted an attorney or attorneys concerning all of his business affairs; that he never knew the deceased to quote poetry; that he was not a religious man; that he never heard him use expressions like "God Bless you," but that, "if he used anything, it would be the opposite"; that the witness, during the time he was employed by the deceased, saw numerous of the deceased's writings and became acquainted and was familiar with his writings; that the signatures to and the writings of the purported will and of the codicils were not in the handwriting of the deceased. This witness, according to his testimony, had been in the insurance and banking business, a court reporter, and clerk of the Supreme Court of Nevada; that he had made a study of handwritings, and, from a comparison of the dis-

puted writings with the standards or undisputed writings of the deceased, he was of the opinion that neither the purported will, nor either of the codicils, was in the handwriting of the deceased.

Albert D. Osborne testified that he resides at Montclair, N. J., and maintains an office in New York City, N. Y.; that he is a son of Albert S. Osborne, who has written a book entitled "Questioned Documents," and another entitled "Problems of Proof"; that for ten years he had been an examiner of disputed handwritings; that he had given all of his time to the subject and read books and studied different systems of handwriting and photography in connection therewith; that he has frequently been called in different courts in New York and in other states to give testimony on the subject of disputed handwritings; that he has made an examination of the writings of the purported will and codicils; that he has made enlarged photographs of the purported will and codicils, and of letters, documents, and other writings admitted to be the writings of the deceased; that he has made enlarged photographs of letters, words, and figures found in the disputed writings and in those not disputed; that such photographs were made to show the general characteristic of the disputed and admitted writings, the spacing between words and letters and the formation, slanting, beginning, and ending of letters. All such matters were pointed out and explained by him in detail, and which, as he claimed, were particularly shown by the enlarged photographs. From a study and comparison of the handwritings and as aided by the photographs, the witness gave it as his opinion that the disputed writings were not in the handwriting of Mr. Yowell, but that such writings were but "clumsy imitations" of the deceased's handwriting. In his opinion the imitator who made the will and codicils had before him some genuine writing of Mr. Yowell which he attempted to imitate, and in doing so there were, in some instances, similarities, but no real resemblance as to forms and outlines of some letters found in the disputed

and undisputed writings, that, as to other letters and words found in the disputed writings, there were marked dissimilarities between the disputed and undisputed writings, especially as to the general characteristic of the writings; that the undisputed writings were in a free, easy, and natural hand and written unconciously and rather rapidly; that the disputed writings were made with a slow and heavy movement of the pen, with frequent pen liftings, writing over or fixing up letters already written or partly written, and fixing up endings of letters; that the general characteristic of the disputed writings shows that they were written in "a hesitating and in a blotchy manner."

The contestants also called a witness who testified that two or three days before the death of the deceased he visited the deceased at the house of Mrs. Miller; that on such occasion Mrs. Miller was in her sitting room and not in the presence of the deceased; that she produced some keys and stated that they were Yowell's keys; that there were two or three keys, possibly half a dozen tied together on a string; that the keys were not in an envelope; that Mrs. Miller stated, "Here are Mr. Yowell's keys and here they are going to stay;" and that she put the keys in her pocket.

Upon this evidence it is the contention of the contestants that there was no real conflict as to the substance of the evidence bearing on the question of whether the disputed writings were or were not written by Mr. Yowell; that the substance of all the evidence, when considered altogether, shows that the writings were not written by Mr. Yowell, and that such was shown by a mere inspection and comparison of the enlarged photographs of the disputed writings with the enlarged photographs of the undisputed writings of Mr. Yowell; that the opinions expressed by the experts of the proponents, being based on a mere comparison of the disputed writings with checks issued by Mr. Yowell, were entirely overcome by the testimony of the witnesses produced by the contestants, who had personal knowledge of and were familiar with the handwriting of Mr. Yowell; that the enlarged

photographs which were produced, interpreted, and explained by the contestants were not disputed by any of the witnesses called by the proponents. Therefore contestants contend that there is no substantial conflict in the evidence.

This is an action at law triable by jury had either party chosen to have the case so tried. In such case our power to consider and review evidence is restricted to a review and determination of mere alleged errors at law, including the competency and sufficiency of evidence to support a verdict or findings as rendered or made. The important questions here are: What weight was the trial court entitled or permitted to give to the testimony and opinions of the expert witnesses of the proponents? And what consideration and weight should we give to conclusions which the trial court may have reached through his own inspection and comparison of the writings in evidence? Many divergent views have been expressed by courts in adjudicated cases as to the value and weight to be given opinions expressed by expert witnesses as to disputed handwritings based on a comparison of handwritings. Some courts hold such testimony, though competent and admissible, to be of weak and doubtful character and as being of the lowest order of testimony; some that such testimony cannot prevail as against and is entirely overcome by testimony of disinterested witnesses who testify from knowledge of or familiarity with the handwritings of the person whose writing is drawn in question. Most courts hold that testimony of comparison handwriting, unless reasons are given supporting the opinions expressed, is of little or no value. Other courts hold the whole matter to be one of weight for the consideration of the jury or the trial judge if the case be tried without a jury, and that there is no general rule which precludes the testimony of an expert or experts from outweighing, in the estimation of the trier of the facts, testimony of witnesses who testified from knowledge of or familiarity with the handwriting of the person whose writing is

drawn in question, or the testimony of one who saw the person in question write the document in dispute. Such divergent views of courts are stated and illustrated in Lawson on Expert & Opinion Evidence, 378; 22 C. J. 786; 11 R. C. L. 387; 3 Jones Comms. on Evidence, (2d Ed.) 2391; 62 L. R. A. 871; 64 L. R. A. 315; L. R. A. 1918D, 655. The general rule deduced from these authorities as being what we believe to be the weight of judicial authority is that the probative force and effect of the testimony of experts in such respect and the weight to be given it is for the jury or the trial judge who is called upon to determine the facts. Such rule is in harmony with various decisions of this court. *Durnell* v. *Sowden,* 5 Utah 216, 14 P. 334; *Tucker* v. *Kellogg,* 8 Utah 11, 28 P. 870; *Smith* v. *Hanson,* 34 Utah 171, 96 P. 1087, 18 L. R. A. (N. S.) 520; *State* v. *Martin,* 49 Utah 346, 164 P. 500.

The evidence adduced on behalf of the proponents was sufficient to sustain the findings. In such case we are not authorized to vacate or disturb them, unless we on the record are justified in holding, which we here are not, that the findings are so manifestly against the clear weight of the evidence as to indicate that it was not fairly or impartially considered by the court below, or that portions of it were arbitrarily rejected or disregarded, or that undue weight was given to other portions of it, or that, in considering the evidence and in reaching a conclusion as to the facts, the trial court misconceived or misapplied the evidence, or was influenced through prejudice or bias. Upon the record brought here for review, we are bound by the findings of fact of the learned trial judge, even though we may be of the opinion that such findings are against the preponderance of the evidence.

This brings us to the further question, viz. whether or not the instrument here in dispute is a valid olographic will, and what effect, if any, should be given to the so-called codicils. The so-called codicils may be disposed of on the ground that

they are not codicils. A codicil is some modification
or qualification of, or addition or supplement to, an
existing last will and testament. Words and Phrases,
First, Second, and Third Series. All there is to the first so-
called codicil is the statement, "Feeling I am failing I trust
all my wishes will be granted." This is addressed to the
Ogden State Bank. No reference whatever is made to any
will. The statement cannot be regarded as an addition or
supplement to, or as a modification, qualification, or expla-
nation of, any will. The writing is not a codicil.

The same may be said of the so-called second codicil. It
is a writing also addressed to the Ogden State Bank. It pur-
ports to be a request of the bank and to make the "request
clear." The instrument refers to a loss of two wills.
No reference is made to any existing will or even as
to either of the lost wills except that they were lost or
destroyed. A statement is made that the savings in the bank
shall not be decreased by courts or lawyers, or by heirs in
the East. On the margin is written "only in Elko, Nevada."
While the meaning is doubtful even when the whole instru-
ment is considered, yet the fair meaning is that the savings
in the Ogden State Bank shall not be decreased by courts,
lawyers, or heirs in the East. It is then recited that "they
shall keep this same in your safety vault equally divided as
fair as can be." Who is meant by "they" is not clear, nor
is it clear what is meant by "this same." The fair meaning
to be given "they" is heirs, or lawyers, or courts, or all of
them; the fair meaning of the words "this same" is the sav-
ings in the Ogden State Bank the only thing of the kind
theretofore referred to. If the testator meant anything else,
it is so vaguely expressed as to be meaningless. Then the
further recitation is made, "For the courtesy shown me in
your bank in life I thank you and ask you to protect the per-
son who is beneficiary to savings I owe you all a favor and
this to be obeyed." This is pointed to as indicating that a
will had been made bequeathing the savings account to some

one and asking the bank to protect some undisclosed beneficiary named or created somewhere and by some undisclosed means, to whom a bequest was made with respect to the savings in the Ogden State Bank. The language is too vague to give it any meaning. We do not see how it can be regarded as an addition or supplement to, or as a modification, qualification, or explanation of, any existing will. All written declarations or statements of a testator cannot be regarded as codicils, unless they in some particular add to or modify, qualify, or explain an existing will. The writings called codicils fail to serve any such purpose.

This brings us to the instrument admitted to probate as the will itself. Our statute, Comp. Laws Utah 1917, § 6316, provides that "an olographic will is one that is entirely written, dated, and signed by the hand of the testator himself." In looking at and regarding the entire instrument, it admittedly is not wholly in the handwriting of the deceased. The trial court regarded all words, figures, and language of the will, whether written by the testator or not, above the words, "I will and bequeath to Mrs. Evelyn C. Miller," as not a part of the will. That portion of the will, beginning with the words, "I will and bequeath to Mrs. Evelyn C. Miller," and ending with and including the signature and address of the testator, was admitted to probate as the will of John W. Yowell deceased. By doing that, the instrument admitted to probate is wholly in the handwriting of the testator. The point that divides the parties on this phase of the case is, Was the trial court justified in disregarding the written and printed portions of the instrument above the words beginning with "I will and bequeath to Evelyn C. Miller," etc., as not being a part of the will?

The law is well settled that an instrument partly written and partly printed may not be admitted to probate as an olographic will if the written provisions are not complete within themselves. It has been held that a testamentary instrument is valid as an olographic will, although it contains words not in the handwriting of

the testator where such words cannot affect the purpose and meaning of the will. *McMichael's Heirs* v. *Bankston,* 24 La. Ann. 451; *Baker* v. *Brown,* 83 Miss. 793, 36 So. 539, 1 Ann. Cas. 371; *Gooch* v. *Gooch,* 134 Va. 21, 113 S. E. 873. See, also, 20 Ann. Cas. 370. The appellants contend that a testamentary instrument is not valid as an olographic will if it contains any word or figure not in the handwriting of the testator. In support of such contention the following cases are cited: *In re Billings' Estate,* 64 Cal. 427, 1 P. 701; *In re Morgan's Estate,* 200 Cal. 400, 253 P. 702; *In re Francis' Estate,* 191 Cal. 600, 217 P. 746; *In re Lakemeyer's Estate,* 135 Cal. 28, 66 P. 961, 87 Am. St. Rep. 96; *In re Thorn's Estate,* 183 Cal. 512, 192 P. 19; *In re Plumel's Estate,* 151 Cal. 77, 90 P. 192, 121 Am. St. Rep. 100; *Succession of Robertson,* 49 La. Ann. 868, 21 So. 586; 62 Am. St. Rep. 672; *Lewis' Heirs* v. *His Executors,* 5 La. 387; *Maris* v. *Adams,* (Tex. Civ. App.) 166 S. W. 475; *In re Noyes' Estate,* 40 Mont. 190, 105 P. 1017, 26 L. R. A. (N. S.) 1145, 20 Ann. Cas. 366; *In re Manchester's Estate,* 174 Cal. 417, 163 P. 358, L. R. A. 1917D, 629, Ann. Cas. 1918B, 227; *In re McMahon's Estate,* 174 Cal. 423, 163 P. 669, L. R. A. 1917D, 778; *In re Bernard's Estate,* 197 Cal. 36, 239 P. 404; *In re Wolcott's Estate,* 54 Utah 165, 180 P. 169, 170, 4 A. L. R. 727.

The respondent contends that the printing and script above the words, "I will and bequeath to Mrs. Evelyn C. Miller," are not a part of the will, and were not intended as such by the testator; that the will was written, dated, and signed by the testator independent of the objectionable printed words, and that therefore the instrument is valid as an olographic will. In support of such contention the following cases are cited: *In re Hail's Estate,* 106 Okl. 124, 235 P. 916; *In re Oldham's Estate,* 203 Cal. 618, 265 P. 183; *In re De Caccia's Estate* (Cal. Sup.) 273 P. 552, 555, 61 A. L. R. 393. Numerous cases dealing with the question now under review are collected in the case of *In re Hail's Estate,* supra. There is some diversity of opinion in the adjudicated cases as to the construction that should be given to statutes similar

to our statute which fixes the requirements of an olographic will. Some courts have adopted a rule which requires a strict compliance with the statute. Others have taken the view that a substantial compliance is sufficient to meet the demands of the statute. This court is committed to the former rule of construction. *In re Wolcott's Estate,* supra, it is said:

"There is no doubt that the deceased intended the document to be her will, but the right to dispose of property by will is governed and controlled entirely by statute. Such statutes are mandatory, and, unless strictly complied with, the instrument, as a will is void. * * *

"The fact that the matter written by deceased in her own hand, standing alone, might constitute a complete testamentary disposition of her property, does not alter the case. * * * The document actually prepared by her does not meet the statutory requirements. In either case the instrument cannot be sustained as a will without arbitrarily setting the statute aside and substituting our will for that of the Legislature. This we have no right or power to do, however much we may appreciate the hardship incident to a strict construction in the present case. Unflinching loyalty to the law, both in letter and in spirit, is the only sure ground upon which to stand."

A strict adherence to the statute which requires that an olographic will must be entirely written, dated, and signed by the testator does not, however, demand that the paper upon which an olographic will is written shall be free from all writing and printing not in the handwriting of the testator. The test is: If the testator intended that any word or figure, not in his handwriting, should be a part of his will, then the instrument is not a valid olographic will, but, on the other hand, if words or figures not in the handwriting of the testator appear on the testamentary instrument which were not intended by the testator to be a part of his will, then the instrument is entitled to be admitted to probate as an olographic will, provided such instrument meets the other statutory requirements. *In re Wolcott's Estate,* supra, this court said: "If the deceased had written across the printed words and figures, or through them, or over them, or entirely regardless of them or their meaning and

effect, her writing alone would have been admissible in evidence to the same effect as if written on blank paper." The test above stated is well illustrated by three cases from California, where the rule of a strict compliance with the statute relating to olographic wills prevails. *In re Bernard's Estate, In re Oldham's Estate,* and *In re De Caccia's Estate,* supra. The instrument here under consideration is dated as required by law independent of the date in which the figures "19" of the year 1924 are printed. The instrument is signed by the testator. The sole question, therefore, remaining to be determined, is whether or not John W. Yowell intended the stanza or the date opposite the stanza to be a part of the will. There is no evidence independent of the instrument touching that question.

*In re De Caccia's Estate,* supra, it is said: "The printed words are in no way essential to the validity of the instrument as an holographic will, and we are not to presume that the decedent made them a part of the instrument he executed without some evidence appearing upon the face of the instrument itself manifesting such an intention. The mere presence of printed matter upon stationery used by a person for the purpose of writing his holographic will which forms no part of the written instrument, and to which no reference directly or indirectly is made in the written instrument, will not destroy the effect of such instrument as an holographic will."

No claim is made, nor can a claim well be made, that the printed matter on the billhead other than the stanza and the "19" in the date was intended by the testator to be a part of the will. It is by no means certain whether the words "My tribute," written diagonally in the upper left-hand corner of the instrument, when considered alone or in connection with the words "To Mrs. Evelyn C. Miller, 2563 Adams Ave., Ogden, Utah," written below the stanza, were intended to refer to the sentiment expressed in the stanza or to the will proper. In its primary sense the word "tribute" means

money or other thing of value paid by one nation or person to another. It may also be used in a sentimental sense. Obviously, the phrase has no relevancy to or place in the will unless it be to express the motive which promoted the testator to make the will. It is reasonably clear that the sentiment expressed in the stanza was not intended for Mrs. Miller alone, because the word "all" at the end of the stanza was, according to the evidence, written by the same person who wrote the will proper. If the stanza were intended to be a part of the will or even the expression of the motive for making the will it would seem that the sentiment therein expressed would have been directed towards and confined to the person who was to become the recipient of the bequest provided for in the will. A sentiment expressed toward "all" cannot well be said to be the probable motive that prompted J. W. Yowell to make a bequest to Mrs. Miller alone. It would therefore seem to be more consistent with the language of the stanza as amended by the addition of the word "all" that the stanza was attached to the paper upon which the will was written merely as a last word of good will towards the friends of the testator rather than as a part of a will by which only Mrs. Miller was to profit. If the testator had intended the stanza to be a part of the will, the natural thing for him to have done would have been to either have placed the stanza in the body of the will or to indicate in the will that the stanza was intended to be a part thereof. The testator did neither. The end of the stanza is about one and one-half inches above the beginning of the will proper. The space between the stanza and the will contains written and printed matter and lines extending across the entire width of the paper upon which the will is written. The written words, "To Mrs. Evelyn C. Miller, 2563 Adams Ave., Ogden, Utah," occupy two lines. Under these words are four lines. Under these lines are the printed words, "Date," "Description," "Charges," "Credits," "Balance," and under the printed words are two more lines extending the entire width of the paper. The will is devoid of any

language which refers to the stanza. The thought expressed in the stanza is at most very remotely connected with the object and purposes of the will. There is no continuity of thought between the stanza and the words which bequeath the savings and the gold to Mrs. Miller. These facts preclude the conclusion that John W. Yowell intended to make the stanza a part of the will.

The date, November 15, 1924, in which the figures "19" are printed appear opposite and to the right of the last two lines of the stanza. That date is separated from the will by the writing, the lines, and the printing on the instrument, the same as is the stanza. The will itself is dated. If the testator had intended that the date placed opposite the stanza should be a part of the will, there would have been no occasion to write the date in the body of the will. Both the stanza and the date which contains the printed figures are placed on that part of the instrument which contains printed matter which is clearly no part of the will. The will was apparently written entirely regardless of the stanza and the date in which the printed figures "19" appear, and without regard to their meaning or effect. It cannot be said that the testator intended to make the stanza or the printed figures "19" a part of his will.

It follows that the judgment appealed from should be, and the same is, affirmed, Respondent is awarded its costs.

CHERRY, C. J., and EPHRAIM HANSON, and FOLLAND, JJ., concur.

STRAUP, J. (dissenting).

I dissent. The photograph, Exhibit A, is the purported olographic will. The photographs, Exhibits B and C, are the purported codicils.

I concur in the view that there is sufficient evidence to support the findings of the trial court that the writings contained in the documents were in the handwriting of the deceased, and that hence such findings are binding on us

notwithstanding they may be against the preponderance or greater weight of the evidence. I also concur in the holding that the so-called codicils, for the reasons stated in the pre- vailing opinion are not codicils.

What divides us is the legal effect to be given Exhibit A, the purported olographic will, because of matters therein contained not in the handwriting of the deceased.

Our statute provides that "an olographic will is one that is entirely written, dated and signed by the hand of the testator himself." The instrument claimed to be the will admittedly is not wholly in the handwriting of the deceased. The trial court regarded all words, figures, and language of the will, whether written by the testator or not, above the words, "I will and bequeath to Mrs. Evelyn C. Miller," as surplusage and unnecessary to a completed will, and ad- mitted to probate only that portion of the purported will, Exhibit A, beginning with the words, "I will and bequeath to Mrs. Evelyn C. Miller," and ending with and including the signature and address of the testator. By doing that, the court gave effect to an instrument as found by the court to be wholly in the handwriting of the testator, and admitted to probate only such portion of the will as so prepared by him. The point is as to whether the court was justified in doing that, or whether in doing so it did not make a will for the testator. *In Re Wolcott's Estate,* 54 Utah 165, 180 P. 169, 170, 4 A. L. R. 727, this court held the statute manda- tory, "and, unless strictly complied with, the instrument, as a will, is void." The court there approvingly quoted from *In re Billings' Estate,* 64 Cal. 427, 1 P. 701, that the statute "requires that a paper, to constitute an olographic will, must be entirely written, dated, and signed by the hand of the testator. It must be entirely written, it must be entirely dated, and it must be entirely signed by him. If it be partly written by him and partly written by another, or printed; if it be partly dated or signed by him and partly by another —it is not a compliance with the statute."

Considering the will as prepared by the testator, it is seen that the figures "19" in the first date of the will, "November 15, 1924," are in print. They are the printed figures of the century date of the billhead used by the testator when he was in business. Added to these and as used and adopted by the testator, are the figures "24" in writing as the year date, thus making the century and year date "1924" partly in print and partly in writing. Were that the only date of the will, such under the authorities would render the will invalid as being not in compliance with the statute requiring the date of the will to be entirely in the handwriting of the testator. *In re Noyes' Estate,* 40 Mont. 190, 105 P. 1017, 26 L. R. A. (N. S.) 1145, 20 Ann. Cas. 366; *In re Francis' Estate,* 191 Cal. 600, 217 P. 746.

Since, however, a complete date, "November 15, 1924," wholly in the handwriting of the deceased as found by the court, appears in other portions of the will, the respondent contends that such and not the first date may be regarded as the date of the purported will, and hence, in such particular, as being in compliance with the statute. Assuming the contention tenable, yet that does not relieve the case from a more difficult question.

The printed words on the billhead on which the purported will was written, the words, "J. W. Yowell, Terms, cash, Interest charged on all accounts past due, claims on account of this invoice must be made within five days after statement is rendered," and the printed words "Date," "Description," "Charges," "Credits," "Balance," may well be held not to impair the will, were it otherwise in compliance with the statute, for it is apparent that such printed matter in no way related to, nor was used or adopted by the testator in connection with, the will, or that any of such printed matter was an inducing cause or motive in making the will, or had anything to do with it. But the printed stanza pasted on the instrument and in connection with the writing of the testator, "My tribute to Mrs. Evelyn C. Miller," the sole

legatee of the will, stands on a different basis. It is apparent that the stanza was no part of the billhead. That is clear. It is just as apparent that it was placed on the billhead by the testator, if it was he who wrote the will, when he prepared it, and that it was put there as a tribute to Mrs. Miller, the sole beneficiary and only legatee of the will. The testator himself so declares in his own handwriting and as a part of the instrument prepared by him as his will. There can be no doubt as to that. There was no other purpose of pasting it on the instrument. It was put there by him as an expression of gratitude toward the legatee, or to show the esteem in which she was held by him, or as a motive in making a bequest to her; and as such it had the same force and effect as though expressions or motives of such character had been written or stated in what the respondent terms the body of the will. It thus cannot be said that the printed stanza in connection with the writing of the testator, "My tribute to Mrs. Evelyn C. Miller," the sole legatee of the will, had no relation to the will and was not a part of it. To the contrary, it had a direct relation thereto, and is a part of the instrument prepared by the testator as his will. When such is made to appear, the effect of it is the same as though the testator had used or adopted any other printed matter or writing of another as a part and parcel of the will. Under such circumstances, the cases cited by the respondent, *In re Oldham's Estate,* 203 Cal. 618, 265 P. 183, and *In re De Caccia's Estate* (Cal. Sup.) 273 P. 553, 61 A. L. R. 393, and other cases to the same effect, are not applicable. In each of the cited cases it was made to appear that the printed words on the stationery or other document or paper on which the will was written were "not expressly, by direct reference, or impliedly, by reference or otherwise, made a part of the written instrument set forth on the sheets of paper upon which they appear," and hence were not regarded by the testator as a part or parcel of his will, nor as having been used or adopted by him as a part of it. The situation here is different. There

can be no doubt that the testator did regard the printed stanza as a part and parcel of the instrument prepared by him as his will. It was put there by him for such and for no other apparent purpose.

The trial court evidently regarded such printed matter as being immaterial and unnecessary to the will and that a complete will was written by the testator without it. But that is not the point. If the matter was in fact used and adopted by the testator as a part and parcel of the will, the court was not permitted to strike or disregard what it may have thought rendered the will invalid, or otherwise shear and trim it, until a valid will was made for the testator. Reasons or motives which a testator may declare in his will in making it, or in making a bequest to one or more legatees, while not necessary or essential to a will, nevertheless are not for such reasons irrelevant or immaterial and to be rejected or disregarded. Sometimes they may be quite relevant and material. The stated reason or motive here was relevant as showing what prompted or induced the testator to make so generous and a rather unusual bequest to one not the natural object of his bounty.

The trial court not only struck and disregarded the stanza characterized by the testator as his tribute to Mrs. Miller, but also struck and disregarded the writing found to be in his own hand, in red ink on the top of the right-hand corner of the document prepared as his will, "Please Mrs. Miller put 10,000 or 9,000 of this to draw int. in Ogden State Bank for 5 yr." If the statement, "put 10,000 or 9,000 of this," etc., does not refer to the savings account in the bank and referred to in what is called the body of the will, it is difficult to see to what else such language could refer. If it does refer to the bequest, as I think it does, then it follows that the writing or the statement must have been regarded by the testator as a part of the will, and as explaining or directing the bequest, or a portion thereof as therein made. I thus do not see what license the trial court had to treat such language or writing, though in the hand of the testator, as not

a part of the will, or as having been written by him without reference to the will. Still more unjustifiable was the trial court in disregarding such language, if it may have thought it to be in conflict with the words, "in fee simple," also written in red ink in what is called the body of the will. In other words, the court was not justified in striking a part of the language of the will so as to avoid a conflict with other language of it, and thereby make a will free from conflicting provisions. I cannot justify that kind of a shearing and a trimming. And just as unjustifiable was the court in regarding as immaterial and not as a part of the will as prepared by the testator, the printed stanza pasted by him on the instrument as his will, and characterized by him in his own handwriting as his tribute to Mrs. Miller, and found side by side with his writing in red ink, "put 10,000 or 9,000 of this" in the Ogden State Bank. To say that neither of these related to and had not anything to do with the will and were not so regarded by the testator is to give an unwarranted meaning to language and an unnatural and senseless purpose for which it was employed.

But further as to this. This court *In re Walcott's Estate,* supra, said:

"The fact that the matter written by deceased in her own hand, standing alone, might constitute a complete testamentary disposition of her property, does not alter the case. The document offered by appellant is not the document prepared by deceased as her will. The document actually prepared by her does not meet the statutory requirements. In either case the instrument cannot be sustained as a will without arbitrarily setting the statute aside and substituting our will for that of the Legislature. This we have no right or power to do, however much we may appreciate the hardship incident to a strict construction in the present case."

So here the will which the trial court admitted to probate was not the document as prepared by the deceased as his will, but was one which was sheared and trimmed by the court so as to make what was thought to be a valid will for him. I see no reason to overrule or modify what with re-

spect to such matter was held by this court in the case of *In re Walcott's Estate,* and had the trial court in this case followed and applied what was there held, it is apparent the purported will could not properly have been admitted to probate.

Ordinarily in a law case, as this is, in reversing a judgment, we but remand the case for a new trial, unless on the record it is apparent that in no event may the plaintiff prevail. I think that the situation here. I therefore am of the opinion that the judgment should be reversed and vacated, and the case remanded to the district court, with directions to dismiss the petition to probate the alleged will.