# Richmond.

## CARSON LIME CO. v. RUTHERFORD'S ADMINISTRATOR.

### JANUARY 14, 1904.

#### Absent, Buchanan, J.*

1. NEGLIGENCE—*Private Bridge—Defective Condition—Invitation to Use.*—The owner of a bridge along a private road is not liable to one attempting to cross it for injuries occasioned by the fall of the bridge, where it appears that neither the public nor the person injured were expressly or impliedly invited to use it, and the owner had endeavored to prevent its use by erecting gates at each end of it, which were kept constantly closed, and frequently locked, and had placed a notice in a conspicuous place on the bridge forbidding its use without application to the owner or his servants, and where the party injured had been instructed by his master and also by the owner of the bridge, to take another route, and the owner had no reason to believe that the instructions would not be obeyed. The owner of the bridge, under the circumstances, owed the person injured no duty, and without this there could be no negligence.

2. MASTER AND SERVANT—*Negligence—Defective Bridge—Notice to Servant.*—A master cannot be held liable for an injury resulting from the fall of a private bridge known by him to be in a defective condition where he used the precautions above set forth to prevent the use of the bridge, and the only notice he had of an intention to use the bridge by the party injured, who had been instructed to take a different route, was his statement that he intended to go over the bridge made to a servant of the owner who had no authority to authorize a disregard of his instruction, or to consent for his master to the use of the bridge, but whose sole duty was to look after a lime kiln when in operation, and to keep an account of the loads of lime delivered, some of which the person injured was handling.

*Judge Buchanan was detained at home by sickness.

Error to a judgment of the Circuit Court of Warren county, in an action of trespass on the case, wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*R. E. Byrd* and *C. W. Forsyth,* for the plaintiff in error.

*Downing & Richards,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This action was brought by James Rutherford, personal representative of his son, Joseph Rutherford, deceased, against the Carson Lime Company, a corporation, to recover damages for the death of the deceased, caused, as alleged, by the negligence of the defendant company. There was a verdict in the lower court in favor of the plaintiff for $1,750.00, and a judgment thereon, to which judgment a writ of error was awarded by a judge of this court.

The demurrer to the declaration was not insisted on in the argument here, and the error assigned to the ruling of the court in refusing to set aside the verdict and grant a new trial, because of the insufficiency of the evidence to establish negligence on the part of the defendant company, is mainly relied upon for a reversal of the judgment.

In our view of the case, that is the only question that requires consideration. The Carson Lime Company, plaintiff in error, was at the time of the accident engaged at Riverton, Warren county, in the manufacture and sale of lime for building and agricultural purposes. For many years the entire works of the company were situated on the northern bank of the Shenandoah river, and some years ago the company bought a tract of land,

known as the Marshall tract, which is opposite and across the Shenandoah river from the main works, and on the south side of the river. Upon this tract the plaintiff in error erected a stave mill, and later, a kiln, and as a means of approach to these premises it constructed a private road, leading from the Southern Railway, at Riverton Junction, to the stave mill and lime kiln, or near thereto, and at a point where this road crossed Happy Creek, which flows between the kiln and the stave mill and the tracks of the Southern Railway, and as a part of this private road, built over the creek a wooden bridge one hundred and sixty-nine feet in length and about the heighth of thirty-five feet from the bed of the stream. There was also a switch connecting the railroad track with the stave mill and kiln. The bridge was wholly upon the property of plaintiff in error, and was closed at both ends by gates, and there was also a sign thereon, certainly up to within a few months before this accident, which prohibited the use of the bridge, except by permission from the office of the plaintiff in error. It had never been dedicated to the public, nor had the public been expressly or impliedly invited to use it. This private road, of which the bridge was a part, was primarily built for the purpose of egress and ingress from and to the stave mill on the Marshall tract; the kiln thereon not having been built till 1898; and the stave mill was totally abandoned in December, 1898, nearly two years before the accident. In the years 1899 and 1900, no building lime was burned at all at the kiln on the Marshall tract, and the kiln was only operated for about two months in each year burning lime suitable only for agricultural purposes, and it had not been in operation for ten months before the accident. The only business, therefore, of any sort carried on by the plaintiff in error on the Marshall tract for more than a year prior to the accident was crushing rock, which was furnished for ballast to the Southern Railway Company, and all this rock was hauled over the switch by the railroad company, and all the agricultural lime

which was burned on the infrequent occasions mentioned, and which plaintiff in error sold, with perhaps the exception of a few lots hauled from the kiln by wagons in 1899, was also hauled over this switch by the railroad; wherefore, at the time of the accident and for some time prior, there was no business of any sort conducted on the Marshall tract, which required the use of the bridge by the public, nor was there any inducement to the public, or to any customer of the plaintiff in error to use it, and plaintiff in error was purchasing nothing on the opposite side of Happy Creek from its main works, and was selling nothing which required the use of the bridge by its customers.

In the early part of the year 1900, W. E. Carson, the general manager for plaintiff in error, discovered that the bridge was unsafe for heavy loads, but safe for light loads and foot passenbers, and the only use made of it thereafter by plaintiff in error was by the men who worked at the crusher on the Marshall tract walking over it to and from their work, or to cross over with light loads or empty vehicles. As before stated, the bridge was enclosed by gates, one at its northern and one at its southern extremity, and the gate on the inside of the bridge was laced with iron, which swung to a post, and was caught with a hasp to keep it closed, a weight being affixed thereto so that it continually pulled the gate closed. On the southern side towards the railroad, there was a double gate, to which was fixed a hasp to close it, and a place at the bottom with a bolt to keep it closed. In addition to the sign on the bridge, the plaintiff in error, up to within a few months at least of the accident, kept the gates locked, and on innumerable occasions the locks were replaced when broken by persons in the effort to use the bridge without plaintiff in error's consent. The sign had been broken down on several occasions, but was replaced, and there is evidence that it probably went down with the bridge when it fell in. At the side of the lime kiln on the Marshall tract a quantity of refuse lime had been thrown, and had laid there for some time,

and was useful only for agricultural purposes. Mr. Henry Downing, of Warren county, owned a farm southeast of the Marshall tract and only separated therefrom by the land of Mr. Bush Maddox, and on several occasions Carson, the general manager of plaintiff in error, suggested to Mr. Downing the purchase of this refuse lime for use on his farm. In these negotiations, which began some time in 1899, and resulted in the sale of the lime in August, 1900, it was understood that the lime was to be hauled by a route over the Maddox land, which was by far the shortest route to Mr. Downing's farm, and the latter cooperated with Carson in obtaining the consent of Maddox that the lime might be hauled over his land. The agreement or understanding between Mr. Downing and Carson as to the route by which the lime was to be hauled was renewed on August 12, 1900, when Mr. Downing announced that he was ready to take the lime and would begin hauling it the next day, at which time Carson was to send some of his men to aid in making any needed repairs to the road over which the hauling was to be done. On the next day, Monday, August 13, 1900, Carson went to the Marshall tract and found Mr. Downing's two teams there ready to begin hauling the lime. The men in charge of the teams stated to him that they had come by the Maddox route, and that while the road was rough it was all right—except that there was some weeds in it. Thereupon Carson, instead of sending men to work the road, or to help to work it, as he had agreed to do, put two of his men to help load the lime on the wagons, telling the teamsters, of whom defendant in error's intestate was one, that they were to haul by the Maddox route, which instruction was but a repetition of the order which Mr. Downing himself had already given his teamsters. After so instructing the teamsters, Carson left the lime kiln, and when the wagons were loaded, instead of returning by the Maddox route, the teams returned to Mr. Downing's farm by the route which carried them over the bridge across Happy Creek, but there is no proof that

plaintiff in error assented to this, or knew of it. The second load made on Monday and the first load made on Tuesday following were carried by the Maddox route, but when the second load (which was the fourth) was gotten on Tuesday, August 14, the teamster determined to go again by the route over the bridge, and upon approaching the bridge they found the gates closed, but not locked, and one of the men with the teams opened the gate at the entrance, whereupon, the two teams, the one right after the other, were driven upon the bridge, the first team of four mules being driven by defendant in error's intestate, who was upon the saddle mule, followed immediately by a team of two horses driven by another of the crew, the result being that a span of the bridge gave way under the front team, precipitating it and the defendant in error's intestate into the creek below, causing him injuries from which he died several days thereafter.

The first question presented upon this state of facts is, was plaintiff in error guilty of any negligence which rendered it liable in damages to the defendant in error? In other words, were the injuries to the deceased the result of a failure to perform a duty which the plaintiff in error owed to the deceased? The only duty suggested as owing from the plaintiff in error to the deceased was, that it should have kept the bridge in good and safe repair; that is, in good and safe repair for use by loaded wagons. Such a duty might have rested upon the plaintiff in error, if an invitation, express or implied, had been given the injured man to cross the bridge with loaded wagons, but obviously there was no express invitation, since it is conceded that it was understood between Mr. Downing, whose servant the injured man was, and the general manager for plaintiff in error, that the lime should be hauled over the Maddox route. In addition, the deceased, as well as all others in charge of the teams with which the lime was being hauled, was instructed, not only by his employer, but by the general manager of plaintiff in error

before any of the lime had been moved that it was to be hauled over the Maddox route.

It is equally clear, we think, that there was no implied or general invitation to the deceased, or to the public, to haul with loaded wagons over the bridge. The bridge was on the private property of the plaintiff in error, and for months prior to this accident every effort had been made by it to prevent its use by the public. It had made persistent efforts to keep the gates locked, and the public was notified by a sign, easily to be read, posted on the bridge, not to cross the bridge except by permission from the office of plaintiff in error. For eighteen months before the accident, the public had done no hauling over the bridge, certainly not with loaded wagons, and plaintiff in error's business was transacted with the general public on the north side of the Shenandoah river alone, where its main works were located. We see nothing whatever in the evidence showing that the plaintiff in error had reason to expect that the deceased would attempt to cross the bridge with wagons heavily loaded with lime, in violation of the express instructions clearly appearing to have been given him by his employer, and which had been repeated in his presence by Carson before any of the lime had been moved. The deceased was nearly fifteen years of age, and is shown to have been a young man of at least ordinary intelligence, and there appears no reason why plaintiff in error should have been on its guard lest he would violate the instructions which had been given him as to the route by which the lime was to be hauled, and hence the plaintiff in error was without reason to consider it necessary for it to take any further precaution against the use of the bridge by Mr. Downing's teamsters in hauling the lime. One of the witnesses for defendant in error who was among the teamsters with Mr. Downing's wagons on the day of the accident, but not on the day before, testifies that one St. John, an employee of the plaintiff in error, was present at the lime kiln when the teams were about to start by the route over

the bridge just before the accident occurred, and that witness said to St. John that they were going by the bridge, as the road over the Maddox route was such they could not go that way, etc., to which St. John made no response, but St. John denies that any such statement was made in his presence, and there is not the slightest evidence that he had any authority whatever to authorize a disregard of the understanding between plaintiff in error's general manager and Mr. Downing, that the lime was to be hauled over the Maddox route, or to give the assent of the plaintiff in error that the teams might pass over the bridge. His uncontradicted statement in substance is that his employment with plaintiff in error was as foreman at the rock crusher, with only the additional duty of looking after the lime kiln when in operation; to keep an account of the loads of lime carried from the kiln and to make report to the office; that he was at the lime kiln on this occasion with the view of performing the latter duty, and that he had no connection or concern with the other works or business of the plaintiff in error at that time, or at any time theretofore.

Whether the understanding between Mr. Downing and General Manager Carson, that the lime was to be hauled by the Maddox route, was due wholly, as is contended, to the consideration that the Maddox route was much shorter than the other, or to the unsafe condition of the bridge, does not alter the case. With that understanding, the lime was sold to Mr. Downing, and plaintiff in error had every reason to expect that it would be carried out, and there is not the slightest testimony that the plaintiff in error had notice of any purpose on the part of those in charge of Mr. Downing's teams to violate that understanding. As to whether Mr. Downing's teamsters were warned of the unsafe condition of the bridge, according to the testimony of Carson and another witness for plaintiff in error, there is conflict of evidence, but that there was the understanding between Mr. Downing and Carson as to the route by which the lime was

to be hauled, is not controverted, nor is it controverted that both instructed the teamsters that they were to haul by the route agreed on, and before any of the lime had been moved.

"An essential ingredient to any conception of negligence is that it involves the violation of a legal duty which one person owes to another—the duty to take care for the safety of the person or the property of the other; and the converse proposition is that, where there is no legal duty to exercise care, there can be no actionable negligence. Therefore, it is reasoned that a plaintiff who grounds his action upon the negligence of the defendant must show, not only that the conduct of the defendant was negligent, but also that it was a violation of some duty which the defendant owed to him." Thompson's Com. on L. of Neg. (2d Ed.), sections 3 and 945. Bishop's Non-Con. L., sec. 446.

The party who affirms negligence must establish it, and this rule is never to be lost sight of. Bailey on P. I., sec. 1674.

In our view of the case at bar, it never got to the point where the contributory negligence of the deceased became a matter for consideration, as the evidence of the defendant in error fails to establish any negligence on the part of the plaintiff in error, rendering it liable in damages in this action.

It is, therefore, wholly unnecessary for us to discuss other questions presented in the record, and the judgment of the Circuit Court complained of must be reversed, the verdict of the jury set aside, and the cause remanded for a new trial.

*Reversed.*