OGDEN LIVESTOCK SHOWS, Inc., v. RICE et al.

No. 6712.   Decided June 2, 1945.   (159 P. 2d 130.)

Rehearing Denied September 7, 1945.

See 25 C. J. S., Damages, sec. 199; 15 Am. Jur., 400.

*Fred L. Finlinson,* of Salt Lake City, for appellant.

*Thatcher & Young,* of Ogden, for respondent.

MORRISON, District Judge.

This is an action at law to recover damages for injuries alleged to have been sustained by plaintiff as a result of

the acts of the defendant Wade in driving his truck loaded with cement over a bridge belonging to the plaintiff. The action is brought upon two counts. The first count is based upon the theory of trespass and the second count is based upon the theory of negligence. The cause was tried to the court sitting without a jury and from a judgment in favor of the plaintiff and against the defendant on plaintiff's second count defendant Wade appeals.

Briefly, the facts are as follows: At the time this cause of action arose and for more than fifteen years prior thereto the plaintiff, Ogden Livestock Shows, Inc., was the tenant in possession of certain land in the vicinity of the Ogden Union Stockyards. Upon this land plaintiff had constructed a coliseum for the purpose of conducting an annual livestock show. A large irrigation canal passed immediately in front of the building to the south and adjacent to a public highway over which plaintiff had constructed a wooden bridge to enable visitors to the show to gain access from the highway to the coliseum. The bridge had a span of approximately 38 feet and a width of approximately 20 feet and was supported by five wooden beams, 18 inches by 12 inches. There were no supports under these beams.

There were two bridges owned and maintained by the Union Stockyards over the same canal. At least one of these bridges was of a steel and concrete construction. One was a short distance to the west and the other a short distance to the east of the bridge belonging to plaintiff and were used by the Union Stockyards and the public gaining access to the stockyards.

During the first part of December 1941 defendant Rice was performing certain work under contract for the Union Stockyards on its property, and had purchased certain cement from the Burton-Walker Lumber Company at a price per bag delivered on the job. Defendant Wade had been engaged to deliver this cement and in so doing attempted to cross the bridge of the plaintiff. Before Wade drove upon the bridge he got out of his truck, made an inspection of the bridge and had some conversation with one,

Murray, an employee of plaintiff who was working at the coliseum. When Wade drove his truck over the bridge it collapsed.

The testimony showed the weight of the truck to be 6300 pounds and that the load consisted of 240 bags of cement weighing 94 pounds each, or a gross load weight of approximately fifteen tons.

At the conclusion of the plaintiff's case the court on motion of plaintiff dismissed the complaint as against defendant Rice.

The trial court entered judgment against the plaintiff and in favor of defendant Wade on plaintiff's first count in trespass, and entered judgment in favor of the plaintiff and against the defendant on plaintiff's second count in negligence for the amount of $900.

The appellant, defendant Wade, makes four assignments of error which may be grouped and summarized as follows:

(1) That the court erred in granting judgment in favor of plaintiff and against defendant Wade on plaintiff's second count. (2) That the court erred in the admission of certain testimony. (3) That the judgment for $900 is not supported by the evidence.

In its cross assignment of error respondent attacks the action of the court in dismissing its first count based upon the finding that defendant was not a trespasser when he drove his truck upon the bridge of the plaintiff.

It is a principle too well embedded in the law of this state to require extended discussion that in an action at law, the findings of the trial court are conclusive and may not be disturbed by this court if there is competent evidence to support them. *Yowell et al.* v. *Ogden State Bank*, 75 Utah 312, 285 P. 285; *Western Union Telegraph Co.* v. *Matthews et al.*, 74 Utah 495, 280 P. 729; *Harper* v. *Tri-State Motors, Inc., et al.*, 90 Utah 212, 58 P. 2d 18; *Vadner* v. *Rozzelle*, 88 Utah 162, 45 P. 2d 561; *Greco* v. *Gentile*, 88 Utah 255, 53 P. 2d 1155; *Van Leeuwen* v. *Huffaker*, 78 Utah 521, 5 P. 2d 714.

The trial court made and entered its finding number two on plaintiff's second count, as follows:

"2. That during the forepart of December, 1941, the defendant Earl Wade carelessly and negligently drove and operated said heavy truck loaded with cement with a total gross weight of 29,960 pounds over and across said bridge, thereby breaking the same and causing said bridge to collapse; that the said defendant Earl Wade was a trucker by profession; that he knew the weight of his load and before passing over said bridge knew, or by the exercise of reasonable care and diligence, should or could have known that said bridge, by reason of the nature and form of its construction, was not strong enough to support or sustain a loaded truck of such weight and that said bridge was neither constructed nor designed to carry loads of that kind or character thereon, but, notwithstanding such knowledge on his part, the defendant carelessly and negligently ·as aforesaid drove said truck over said bridge; that defendant, notwithstanding he knew of the excessive weight of said load, further carelessly and negligently failed to ascertain from plaintiff or its officers and agents whether or not said bridge was capable of sustaining said weight before attempting to cross the same."

If there is any competent evidence from which the court was justified in concluding that the defendant Wade was negligent in driving his truck upon the bridge, the finding must be sustained and for this purpose we must refer to the testimony.

The evidence showed that defendant Wade was a trucker by occupation, that he had considerable experience hauling heavy loads over highways and bridges of various construction, that he knew the weight of his load to be approximately fifteen tons, that he thought it to be an unusually heavy load, that there was a question in his mind as to whether the bridge would hold up under his load and he therefore stopped his truck, got out and observed the bridge both from the surface and from underneath. The evidence further showed that the bridge was of wooden structure throughout, supported by five 12 x 18 inch beams or stringers, over a 38 foot span and that there were no supports of any kind under these stringers. Defendant Wade also testified that from all outward appearances the

timber seemed to be well preserved and solid and that after his inspection he concluded that the bridge could be safely crossed with his load. The testimony also shows that Wade knew of the presence of the other two bridges in close proximity to the plaintiff's bridge and of their general construction. Wade also testified that he was aware of the fifteen ton load limit posted on the steel viaduct over the railroad yards as he approached the plaintiff's bridge and the general structure of the viaduct with respect to braces and supports.

We are not in disagreement with the holding of the court in the case of *Board of Com'rs of Allen County* v. *Creviston*, 133 Ind. 39, 32 N. E. 735, cited by appellant to the effect that if the load which one proposes to transport over a bridge is an undue or unusual one there is a duty on his part to make some investigation or examination. The fact that Wade did stop and make what must be admitted to amount to more than a casual or superficial examination of the bridge, indicates some apprehension on his part and lends credence to his statement that his load was an unusually heavy one. There is nothing in the record which could lead to the conclusion that Wade failed to discover any defects in the bridge itself which a reasonably prudent man should have discovered, but were the conclusions reached by him and his subsequent attempt to cross the bridge such as one would expect of a reasonable and prudent man? The thirty-eight foot span of bridge; the five unsupported stringers under the bridge; appellant's knowledge of the weight of his load; his knowledge of the close proximity of two other bridges of unquestioned strength easily accessible to him; his knowledge of the general construction of the steel viaduct and its load limit, are all circumstances which must be taken into consideration by the trier of the facts.

The court had an opportunity to see and hear the witnesses and determine from all the testimony whether an ordinary man under all the circumstances attending the incident would have proceeded to cross this bridge with a truck load of cement such as defendant had. The court

found this to be negligence. Reasonable men might differ in their conclusions as to whether the facts in such a case would amount to negligence, but we must conclude that there is sufficient evidence to support the trial court in its findings.

The measure of damages sustained through the destruction of improvements to real estate which have no market value is the fair and reasonable value of the thing destroyed at the time of its destruction. *Cleary* v. *Shand*, 48 Utah 640, 161 P. 453; *Wichita Falls & N. W. R. Co.* v. *Gant*, 56 Okl. 727, 156 P. 672; *St. Louis, I. M. & S. R. Co.* v. *Weldon*, 39 Okl. 369, 135 P. 8; *Gosliner* v. *Briones*, 187 Cal. 557, 204 P. 19.

Appellant contends that it was error to permit the witness to testify to the cost of the construction of the new bridge and the difference between the cost of the new bridge (less the cost of the foot bridge) and the value of the old bridge represented the betterment or increased value of the new bridge over the old. In the case of *Kennedy* v. *Treleaven*, 103 Kan. 651, 175 P. 977, 978, 7 A. L. R. 274, this question was discussed and the court said:

"There is no universal test for determining the value of property injured or destroyed, and the mode and amount of proof must be adapted to the facts of each case. * * * If there be no market value, then other criterion of value must be found, and the best evidence which can be obtained must be produced to show the elements which enter into the real value. * * * The cost of replacing the building, making a proper deduction for its age, utility, use, and condition, is a better measure of what the property was fairly and reasonably worth at the time it was destroyed."

We cannot say that the trial court was in error in admitting this testimony as one of the factors tending to establish the value of the bridge at the time of its destruction.

Plaintiff called one, Campion, a general contractor of twenty years' experience, who testified that he was acquainted with the bridge that had been destroyed, its

general construction and condition. He also testified that he constructed a new bridge to replace the one that had been destroyed and that the cost of the new bridge also included the cost of constructing a foot bridge alongside the new bridge. Over defendant's objection the witness was permitted to state that the total cost of constructing the new bridge and the foot bridge was $1352 plus $89 for surfacing the bridge after it had been constructed. This was in addition to one beam of the old bridge that was used in the construction of the new one. He also testified that the estimated cost of constructing the foot bridge was $250.

The witness was then asked if he were in a position to give an opinion as to the value of the bridge immediately before it was broken after giving due consideration the usual life of bridges, cost of replacement, etc. His answer was as follows:

"Well, then, I would say the bridge—just as a guess, is all I could do—would be worth eight or nine hundred dollars."

He was asked again whether that amount was his opinion to which he replied that it was.

Appellant contends that the value of $800 or $900 was just a guess and is not sufficient to sustain a judgment for any amount and particularly for $900. From the testimony given we conclude that the answer made by the witness must be taken to mean that from his experience as a builder, not having specific detailed information with respect to the bridge, but considering the replacement costs, that it was his best judgment the value of the bridge was somewhere between $800 and $900.

The testimony of the witness that the value of the property destroyed was $800 or $900, would seem to imply that he did not know whether one amount was more accurate than the other. In such case the higher amount would not preponderate over the lower amount and it would seem that the court would be bound to assess the damages at the lower figure.

We conclude that there is no substantial evidence to support the verdict for $900 or any amount in excess of $800. The verdict must be reduced to $800.

Having reached these conclusions it is unnecessary that we consider respondent's cross assignments of error. It follows, therefore, that the judgment of the District Court as modified should be affirmed, respondent to recover its costs.

McDONOUGH, Justice (concurring).

I concur in the result reached in the opinion of Judge MORRISON. I agree with Mr. Chief Justice LARSON that the defendant was not negligent in failing to discover any defect in the bridge and that his inspection was such as to preclude a finding by the trier of the facts that it was not such as to meet the requirements of the law as to discovery of defects; but since I am of the opinion that the trier of the facts was not bound to conclude that the bridge collapsed because of the giving away of the deteriorated laminated deck, but may have reasonably found that it gave way because of it being subjected to a strain in excess of its designed capacity, I am of the opinion that the judgment below should be upheld.

At the outset it is necessary to ascertain the legal relationships of the parties involved regarding the use of the damaged bridge for the rights and duties of the parties must be determined in light of such relationships. The land upon which the bridge was located was and is owned by the Union Stockyards. The plaintiff, Ogden Livestock Shows, Inc., constructed a coliseum building on some of the lands owned by the Union Stockyards. On December 1, 1925, these two companies entered into a lease agreement under which the plaintiff was given a right of way across the lands of the Union Stockyards as a means of ingress and egress to and from the coliseum building.

In order to travel from 24th Street in Ogden to the coliseum building over the described right of way, it was

necessary to cross a canal. The plaintiff, in order to make its rights under the lease effective, constructed a bridge over the canal. It is this bridge which the defendants damaged. This lease agreement does not mention the bridge or make any express reference to the building of one. However, the owner, of the dominant estate can make such changes on the servient tenement as are necessary for the proper exercise of the easement. *Willard* v. *Stone,* 253 Mass. 555, 149 N. E. 681; *Missionary Soc.* v. *Evrotas,* 256 N. Y. 86, 175 N. E. 523.

The right of the stockyards corporation to use the easement as distinguished from the bridge is clear for in this regard the lease expressly provided that the easement was "subject to the joint use of both" the stockyards corporation and the plaintiff. Even aside from such an express provision the right of the stockyards corporation to use the easement could not be questioned. See *Stevens* v. *Bird-Jex Co.,* 81 Utah 355, 18 P. 2d 292; Tiffany Law of Real Property, 3rd Ed., Vol. 3, Sec. 811, p. 355.

The defendants are at the most permittees of the stockyards corporation. Defendent Rice was an independent contractor doing construction work for the stockyards corporation. Defendant Wade was delivering a load of cement to defendant Rice and must be held to have been a business invitee of Rice. Thus it can be noted that the plaintiff, occupying the position of the dominant estate holder, constructed a bridge in order to make the grant of the right of way effective. The servient estate holder, the stockyards corporation, reserved a right of joint user over this way. The defendants using the right of way as permittees of the stockyards corporation, had no better right to use the bridge than did the stockyards company. Our problem is one of determining the limitations on the right of the stockyards company to use the bridge.

The case of *Herman* v. *Roberts,* 119 N. Y. 37, 23 N. E. 442, 443, 7 L. R. A. 226, 16 Am. St. Rep. 800, involved a similar problem. There the plaintiff had been granted a right of way over the lands of the defendant. The way was rocky and unsuited to travel. Plaintiff, at considerable

work and expense, prepared the way so that it could be used for a carriage road, although the grant did not expressly provide that such a road should be constructed. After the work was completed the defendant commenced to use the road by taking heavy loads over it. These heavy loads damaged the roadway and increased the costs of upkeep and repair. Suit was brought by the plaintiff, dominant estate holder, to enjoin the use of the roadway by the defendant, servient estate holder. The court in an excellent discussion sets forth the respective rights and duties of the parties. The court said:

"The idea of a joint use of the land by both parties, in the sense that a use by the grantee should at any time give way to a use by the grantor, is contrary to the plain meaning and intent of the grant. It cannot be supposed that the grantor, when conveying a right of way over an impassable tract of land, intended to restrict his grantee from changing its surface so as to make it passable and available for the purpose of a road, or that, after the road had been so constructed, he had the right to enter upon the land and impair its usefulness, or impose upon the grantee the duty of keeping such impaired road in repair for the benefit of the grantor. The full extent of the rights of the grantor in the soil of the road was to enter thereon, and do such acts only as should not injure or impair the enjoyment of the easement by the grantee, and when he went beyond such use he transcended the rights pertaining to his character as the owner of the soil. The general character of these rights is familiar to all owners of land, because they are common to all whose lands abut upon public roads, and they are varied only by the character of the easements enjoyed, and the terms of the grants under which they are possessed. Unless, therefore, something can be found in the terms of the grant which modifies the easement created, that must be held to be the measure of the rights of the parties. No inference can be drawn from the present grant that it was intended that the grantor should enjoy the unrestricted use of the road, with the privilege of so wearing and using it as to subject the grantee to the labor and expense of keeping it in repair. It is apparent from the character of the property affected, and the use to be made thereof, that the plaintiff expected to construct a carriage road for access to and communication with his residence as a gentleman's country seat. It could not have been contemplated by the parties that such a road was to be used for farming purposes, to draw heavy loads over, and cut it up by the use of the various appliances needed for such purposes.

The land over which the road was laid out had never before been so used, and the owner of the soil had theretofore obtained access to his land from the public road by entering upon and traveling over it in other places. The land itself was of small compass, and little value, as it was hilly, rocky, sterile, and unadapted to agricultural uses; and it could not, under the circumstances, have been intended that the road was to be built and used to any considerable extent for farming purposes by either the grantor or grantee.

\*     \*     \*     \*     \*

"It is not supposed that it was the intention of the court below to wholly preclude the defendant from the use of the road-way by passing over or across it in such manner as should not materially obstruct passage or injure the road-bed; but it was only intended to prevent an unreasonable use thereof which should sensibly impair its condition, or render its use offensive and impracticable to the plaintiff and others having lawful occasion to pass over it."

From this holding it appears that the servient estate owner has the right to use a way constructed by the dominant estate owner for the purpose of making the grant of the way effective. This right of use by the servient estate owner is, however, limited to those uses which do not interfere with the use of the way by the dominant estate holder nor injure the roadbed; that the dominant estate owner could by injunction prevent any unreasonable use of the way which should "sensibly impair its condition." A similar statement was made by this court in *Stevens* v. *Bird-Jex Co.*, 81 Utah 355, 18 P. 2d 292, in which we noted that the servient estate owner,

"may himself use the way, or permit others to do so, subject to the limitation that his use or the use of his permittee must not be such as to impair the enjoyment of the easement by the owner of the dominant estate, or subject him to extra expense in keeping it in repair, and it is not necessary that he expressly reserve such right."

Applying these holdings to the instant case, it would appear that the stockyard corporation (servient estate holder) had the right to use the bridge or permit others to do so, subject to the limitation that the use should not materially obstruct the use by the plaintiff (dominant estate

holder) or subject the bridge to unreasonable use which "should sensibly impair its condition."

No case has been cited by counsel involving a suit for damages to a bridge caused by overloading. Research indicates that few such cases can be found. There are, however, a few such cases which are helpful.

In *Thompson* v. *Matthews*, 2 Edw. Ch., N. Y., 212, the defendants were hauling extra heavy loads of rock over the toll bridge of the plaintiff. Plaintiff sought to enjoin the use of the bridge for the hauling of such heavy loads. The Vice-Chancellor refused to enjoin. It was concluded that the bridge was a public one even though the plaintiff could collect tolls. The court then stated:

"But this is a case in which the parties have legal rights. The bridge is a public one. If persons take improper loads and the bridge has been properly constructed, then the owners of it have a remedy by a special action on the case or in trespass for damage done; while, on the other hand, if passengers and their property should sustain an injury by a breaking from ordinary loads, the owners must respond in damages. The law affords a reciprocal remedy in all such cases; and I shall leave the parties to their legal right."

*Township of Livingston* v. *Parkhurst*, 122 N. J. L. 598, 7 A. 2d 627, is another case involving damage to a public bridge from overloading. The case involved a suit by the township for damages caused by the overloading of a small wooden bridge. The bridge had a capacity of 15 tons but its capacity was not posted. It was fairly well constructed and in good condition. The bridge was designed to handle passenger cars, delivery trucks and coal trucks. The defendants took a truck hauling a 28 to 30 ton shovel across the bridge causing it to collapse. The trial court non-suited the plaintiff. On appeal the judgment of the lower court was reversed. The holding of the Supreme Court was that there was a duty on the part of one using the highways and public bridges to use them with reasonable care.

These last two cited cases stand for the proposition that even a public bridge must be used reasonably. One taking

unreasonably heavy loads upon the bridge is held liable for any damages occasioned from the overloading. The defendants in the instant case as permittees of the servient estate owner would be held at least to as high a duty as the user of a public bridge.

There is another line of cases holding that to take extraordinarily heavy loads over a public highway or bridge so as to damage them is a public nuisance. See *Commonwealth* v. *Allen,* 148 Pa. 358, 23 A. 1115, 16 L. R. A. 148, 33 Am. St. Rep. 830; *Henry Butt & Co., Ltd.* v. *Weston-Super-Mar Urban Dist. Council,* 1922, 1 A. C. 340. The same view is set forth in 3 Salk. 182, 91 Eng. Reprint 764, where, without noting the particular case referred to it is stated:

"Information against a common carrier, setting forth that no wagon ought to carry more than 2000 weight; and that the defendant used a wagon with four wheels, and cum inusitato numero equorum, in which he carried 3000 or 4000 weight at one time, by which he spoiled the highway leading from Oxford to London * * *. This was adjudged good * * * because it was the excessive weight which he carried that made the nuisance."

See also *Sumner County* v. *Interurban Transp. Co.,* 141 Tenn. 493, 213 S. W. 412, 5 A. L. R. 765, in which the court held that while the legislature had the right to restrict the use of the public roads by trucks carrying extra heavy loads the court could not enjoin such use in the absence of legislation. The county had sought to enjoin the use of the county highways by trucks carrying excessive loads which were damaging the highways.

It appears fundamentally sound to restrict the use by the servient tenant or his permittees of a way prepared and maintained by the dominant tenant. Unrestricted use of the way by the servient tenant, without regard to the increased burden of upkeep and repair, could in effect destroy the grant of the way. In the absence of some provision in the grant which would indicate that the servient tenant was to have unrestricted use of the way with the right to so use as to increase the expense of upkeep and

repair no such right should be inferred. The use of the way by the servient tenant should be limited to those uses which will not unreasonably interfere with the use of the way by the dominant tenant. If the servient tenant or his permittees use the way so as to damage it (such as by overloading the bridge) he should respond in damages unless it appears that the damage was entirely without fault on his part.

The facts indicate that the parties contemplated that the plaintiff in this case would have to construct a bridge in order to make the way usable. There is, however, nothing to indicate that the bridge was to be designed to hold any and all loads which the servient tenant might bring upon his lands. The servient tenant had the right under the above cited cases to use the way and the bridge—but the use was limited by the design and constructed capacity of the bridge. The use was to be the use to which the bridge was normally and ordinarily adapted. If the defendants, as permittees of the servient tenant, went beyond the scope of this use to which the bridge was adapted, they should be held liable for all resulting damage. The absolute limitation of the right of the defendants to use the bridge was to use it in accordance with the uses to which it was reasonably adapted. If they went beyond this, they are in effect trespassers. Thus, if the bridge had a designed capacity of ten tons, as Campion's testimony is reasonably susceptible of being construed, then the defendants were liable for taking 15 tons upon it. This should not be made to depend upon whether the bridge, in the eyes of an ordinary truckman, looked as though it would hold the 15 ton load. Defendants had no right to gamble with the plaintiff's property. They had no right or license to take excessive (in excess of its designed capacity) loads over the bridge. To do so was a trespass. If Campion's testimony can be construed as evidence that the bridge was designed to hold a maximum of 10 tons, the defendant Wade should be held liable, without regard to any possible error in judgment, for it is not disputed that he took a 15 ton load upon the bridge.

A witness, Campion, who rebuilt the bridge after its collapse, and who was experienced in building such structures testified on cross-examination that the bridge in his opinion would carry "six, eight, or ten ton loads, or something like that without any trouble." This testimony was brought out on cross-examination. Of course, no assignment is made as to its admissibility, since defendant elicited it. If the trial court was satisfied that in light of this testimony and of the facts and circumstances relative to the collapse of the structure, the defendant drove onto the bridge a load in excess of its designed capacity, its finding in that regard should not be by us disturbed. Furthermore, as stated at the outset, the evidence is not such as to compel a finding by the trial court that the giving away of the laminated deck was the cause of the collapse, and but for its condition the bridge would not have broken.

WOLFE, Justice, concurs in the views expressed by Mr. Justice McDONOUGH.

LARSON, Chief Justice (dissenting).

If a bridge breaks while a person lawfully entitled to use it is crossing with a load, is such user liable in damages? If so, is such liability predicated upon negligence of the user? What constitutes negligence in such a case? These are the questions involved in this appeal from the District Court of Weber County. These are the essential facts. Ogden Union Stockyards, a corporation, owned certain lands in Weber County upon which it operated livestock feeding and sales yards. By written lease it let the plaintiff Ogden Livestock Shows, Inc., a small tract of land upon which plaintiff constructed a building called the coliseum, as a place to conduct livestock shows, athletic events and exhibitions of a general public character. This lease covered the ground occupied by the building, and a right-of-way 14 feet in width immediately adjoining said building on the east, north and west sides, for the purpose of ingress and egress to and from said building; also including a right-

of-way approximately 203 feet long for ingress and egress over the lands east of the building from the building to West Twenty-fourth Street, all said rights-of-way being "subject to the joint use of both the company and the association." The Hooper Canal crossed the tract of land east of the coliseum, over which land the aforesaid right-of-way was granted. To enable it to use the granted right-of-way, plaintiff constructed over this canal a bridge 20 feet wide with a span of approximately 38 feet. It was a wooden structure, supported by five wooden beams, 18 inches high and 12 inches wide; across these was a laminated deck of 2x6 inch planks set upon edge and spiked together; over this were plank runways across the bridge, and the top of the whole bridge was covered with asphalt. In 1941, the Stockyards was making some improvements on its property. Defendant Wade was to deliver the cement for this job on the property. He arrived at the bridge in question with a truck load of cement. The truck weighed 6300 pounds and was loaded with 240 bags of cement weighing 94 pounds each, making a gross load weight of approximately fifteen tons. Before crossing the bridge, Wade stopped and talked to Murray, an employee at the Coliseum, about the bridge, got under it, examined it, concluded it would hold his load, and started across. Just as the front wheels of the truck got to the opposite bank, the bridge gave way under the rear wheels and sagged down to the ground. Plaintiff brought this action against Wade to recover the costs of building a new bridge. The court found for plaintiff and defendant appeals, presenting for resolution the questions posed at the beginning of this opinion.

It seems well settled by the authorities that if by the wrongful act of a third person, a bridge maintained by a public corporation is damaged, the corporation may maintain an action against such person for the expenses of repair. 4 R. C. L. tit. Bridges, p. 216; *City of Marinette* v. *Goodrich Transit Co.*, 153 Wis. 92, 140 N. W. 1094, Ann. Cas. 1917B, 935; *Texas & P. R. Co.* v. *Interstate Transp. Co.*, 155 U. S. 585, 15 S. Ct. 228, 39 L. Ed. 271, wherein the

court says an action will lie if the "injuries have been negligently or wantonly inflicted upon the bridge." So also where a bridge erected lawfully but constituting private property is injured by the negligent act of another its owners have a right of action against the person causing the injury. *Texas & P. R. Co.*, v. *Interstate Transp. Co.*, supra; *Bucki* v. *Cone*, 25 Fla. 1, 6 So. 160; *Cue* v. *Breeland*, 78 Miss. 864, 29 So. 850; *Chico Bridge Co.* v. *Sacramento Transp. Co.*, 123 Cal. 178, 55 P. 780; *State* v. *Yellow Baggage & Transfer Co.*, 211 Wis. 391, 247 N. W. 310; 11 C. J. S., Bridges § 99, p. 1136; 8 Am. Jur. 973; Annotation, Ann. Cas. 1917B, 938. But this liability must be based upon negligence or wanton wrongdoing. This is an indispensable factor. *St. Louis, etc., Packet Co.* v. *Keokuk & H. Bridge Co.*, C. C., 31 F. 755; *Chico Bridge Co.* v. *Sacramento Transp. Co.*, supra; *New Westminster* v. *Steamship Maagen*, 18 Brit. Columbia 441. In the St. Louis Packet case the court said that all duty demanded was that one use ordinary skill and care. In *Highway Com'rs* v. *Chaffee*, 1 Mich. N. P. 147, the court in charging the jury as to the nature of liability for injury to a bridge said:

"The common-law rule is to be here strictly applied, 'whoever to the injury of another, neglects a duty which he ought to perform by law, becomes liable to compensate the injury or damage.' The test is this: in order to avoid doing a damage to the property of another, a person is bound in law to such care in the use of his own property, as a prudent man would employ, under similar circumstances, if he were himself the owner of the property exposed to damage." (Quoted in note in Ann. Cas. 1917B, 939.)

And the burden is upon one desiring to use a bridge to exercise ordinary care for his own safety, and to exercise ordinary care to avoid injuring the bridge.

The Ohio Court in *Board of Com'rs of Hardin County* v. *Coffman*, 60 Ohio St. 527, 54 N. E. 1054, 1058, 48 L. R. A. 455, stated the rule to be that one desiring to transport property over a bridge is not chargeable with negligence unless the appearance of the bridge, its situation or struc-

ture or other circumstances would suggest to a person of ordinary prudence that it was defective or dangerous, so that ordinary care would require that he forgo the use of it or make sufficient examination to reasonably assure him of its safety. The court then poses as a test, the question:

"Were the circumstances such that a person of ordinary prudence, in the exercise of ordinary care in the situation of the deceased, would reasonably apprehend and anticipate that it would be dangerous to go upon the bridge in that way?"

The Pennsylvania court said:

"The question is, whether the apparent condition of the bridge on that date * * * was such as ought to have led a man of ordinary prudence to foresee that it could not be used safely by the exercise of reasonable care." *Schneider* v. *Mill Creek Borough*, 52 Pa. Super Ct. 436.

And the Michigan Court in *Comstock* v. *Georgetown Tp.*, 137 Mich. 541, 100 N. W. 788, 795, said the test was "whether he was as prudent as men generally." In *Kolsti* v. *Minneapolis & St. L. Ry. Co.*, 32 Minn. 133, 19 N. W. 655, 656, we read:

"When the question is, did a person use ordinary care in a particular case, the test is the amount of care ordinarily used, by men in general, in similar circumstances."

The Wisconsin court in *Walker* v. *Village of Ontario*, 118 Wis. 564, 95 N. W. 1086, said that in bridge cases ordinary care is such as would be suitable to or commensurate with the hazard or risk which would naturally attend the crossing of the bridge. To like effect is *County Com'rs* v. *Timmons*, 150 Md. 511, 133 A. 322. One approaching a bridge which one may lawfully use, with only such vehicle or load as is usual, or as not infrequently crosses the bridge, may assume the bridge is safe, and cross without inquiry or investigation, unless there is something about the structure, or some knowledge has come to him, or some warning been given which should put him on inquiry as to the safety

or strength of the bridge. *Board of Com'rs* v. *Creviston,* 133 Ind. 39, 32 N. E. 735. But where one approaches a bridge with an extraordinary or unusually heavy load, or with an unusual vehicle which may increase the strain or the vibration, one is under duty to consider the strength of the bridge and exercise ordinary care in determining that matter before crossing. *Board of Com'rs* v. *Creviston,* supra.

What then constitutes ordinary care on the part of one lawfully using a bridge in determining the capacity of the bridge to carry his load? It is simply such care as an ordinarily careful and prudent person would use, and such care does not require that the mind of the user be free from doubt as to the capacity of the bridge. In *McDermott* v. *Ida County,* 186 Iowa 736, 171 N. W. 690, 692, where plaintiff sued to recover for the death of her intestate caused by a bridge caving in under his load, the court says:

"Instruction 9 offered asked the court to charge that, if it was a question in the mind of the decedent whether the bridge would carry the load he was attempting to take across it, it should find for the defendant. *Obviously this is not the law.*" (Italics added.)

The Indiana court in *City of Wabash* v. *Carver,* Ind. Sup., 26 N. E. 42, 43, stated the rule thus:

"One who contemplates going upon a bridge with a vehicle of unusual construction, or with a load of extraordinary weight, must himself ascertain the probable sufficiency of the bridge, and take notice of the condition and apparent strength of the structure, of the purpose for which it was built, and of the kind of vehicles ordinarily used thereon; and if, without knowledge or prudent inquiry or investigation concerning its capacity, condition, or use, he subjects it to an extraordinary strain, he must take the risk of injury."

In *Moore* v. *Hazelton Tp.,* 118 Mich. 425, 76 N. W. 977, the Michigan Court said the law is that if a person had actual knowledge or was in possession of facts or circumstances or information concerning the condition of the bridge which would put reasonable, careful and prudent

men upon inquiry as to whether the bridge was in a condition reasonably safe to drive upon, it would be negligence for them to do so without first making careful examination for the purpose of determining whether the bridge was safe for them to drive upon. The rule as stated by the Supreme Court of Nebraska in *Seyfer* v. *Otoe County*, 66 Neb. 566, 92 N. W. 756, is that if one has an extraordinary load or reason to doubt the capacity of the bridge, it would be negligence to go upon the bridge without examining it to ascertain its condition.

The Minnesota court elaborated more fully upon the act of the user in examining the bridge by stating that when such examination was made, the user was charged with full knowledge of what the examination would disclose at the time when he drove upon it, that is, he was held to the knowledge of the results a reasonable examination would have shown. *Anderson* v. *City of St. Cloud*, 79 Minn. 88, 81 N. W. 746, 7 Am. Neg. Rep. 604. Justice Barden of Wisconsin succinctly stated the obligation of one about to use a bridge in this language:

"If the defects mentioned were so obvious that, in the exercise of ordinary care, the plaintiff could have discovered them, then, of course, he was guilty of negligence in attempting to cross. * * * Ordinary care does not require him to make the test spoken of by the witness. He was only bound to make * * * such observations as common prudence would seem to dictate, in view of his knowledge and all the surrounding circumstances." *Walker* v. *Village of Ontario*, 111 Wis. 113, 86 N. W. 566, 567.

The test referred to was a claim that he should have taken a bit and bored into the timbers to see if there were defects not visible from the outside. The Courts of New York have indicated that if an inspection is made and the conclusion reached that the bridge will carry the load, there is no negligence. And in *Heib* v. *Town of Big Flats*, 66 App. Div. 88, 73 N. Y. S. 86, they said that whether a prudent man would have deemed it safe to cross the bridge *without inspecting the stringers*, would be a question for the jury.

In *Higgins* v. *Garfield County*, 107 Neb. 482, 186 N. W. 347, it was held that one was not guilty of negligence in attempting to cross a bridge although he knew of a defective plank therein, where with this exception, the bridge otherwise looked perfectly safe to him. So too in *Young* v. *Madison County*, 137 Iowa 515, 115 N. W. 23, it is said that if the bridge was defective, and the defect was or should have been apparent to them as reasonably prudent persons, then in crossing the bridge they could be charged with negligence. The rules fairly deducible from the cases are that one is not guilty of negligence in crossing a bridge with a load under which the bridge sags and breaks if one exercised ordinary care in going upon the bridge with his load. That in the absence of special notice of caution, one is not guilty of negligence (want of ordinary care) in going upon a bridge without inspection, if his vehicle, or load is not greater than that taken over the bridge by other parties. One who approaches a bridge with an extraordinary load, that is one appreciably heavier than others have taken over the bridge, or so heavy as to be unusual in the neighborhood, may not assume the bridge is sufficient in strength but owes the obligation to inspect it in the exercise of reasonable care. In making examination, he is bound only by what his senses as an ordinarily prudent man would reveal to him. If after making such examination as a prudent man would do under the circumstances, he reasonably concludes the bridge will carry his load safely, there is no negligence in driving upon, or over the bridge.

Let us examine the instant case in the light of these pronouncements. Negligence, if any, is to be found in this case, must be inferred. No one doubts that in law negligence may be inferred, but there must be facts from which the inference may be deduced. This leads us to a consideration of what facts there are from which such inference may be deduced. We find none except the fact that the bridge caved in under the load, and this is not a case where res ipsa loquitur applies on the matter of negligence. *Branch Storage Co.* v. *Bucks County*, 101 Pa. Super. 30. Had it

appeared that Wade failed to examine the bridge before driving upon it, or that in examining it he failed to discover weaknesses or defects in it which he should have discovered, and which would have led an ordinarily prudent man to conclude the bridge was not safe, the inference might have been deducible. But there are no such facts here. All the evidence reveals that Wade was careful; that he made a close inspection of the bridge, and that no defects were discoverable. When Wade came to the bridge he stopped, asked Murray, an employe at the coliseum, if the bridge would hold the load, and Murray says he told Wade to look at the bridge and see. That Wade got down under the bridge and examined it. Wade says Murray and he got under the bridge together, and Murray said: "A bridge with stringers as big as that will hold up a load like that easily." Everybody agrees that Wade made much more than a casual inspection of the bridge and concluded it was safe. Campion, a witness called by plaintiff, testified that had he examined the bridge before it broke he would have concluded it was in a good state of repairs. It is conceded no defects could be discovered from an inspection of the bridge. The stringers were in good condition and did not break from the weight of the load. In fact one stringer was used again in the new bridge. The planking running crosswise of the bridge, over the stringers, had decayed from the top, which was not visible, and broke between stringers letting the wheels through and the thump of the axles on the stringers broke them. Campion testified that in his opinion the bridge in the condition it was would have carried a ten ton load easily. Wade and Murray each decided that the bridge would carry the load. There is no evidence that Wade should have known or had any reason to think the bridge would not suffice. The evidence shows that had the cross planking not been rotted at the top, where it was not discoverable; had it been in as good condition as it appeared to be upon examination, the bridge would have carried the load. The stringers would not have broken had not the planking given way and dropped the loaded truck on the stringers.

I find no basis for any inference of negligence. What should Wade have done that he did not do to relieve himself from the imputation of negligence? But assuming that negligence could be inferred from the fact that the bridge broke under the load, such inference is completely dissipated by the other evidence, uncontradicted, and showing an absolute lack of negligence. *Richards* v. *Oregon Short Line Railroad Co.*, 41 Utah 99, 123 P. 933; *Christensen* v. *Oregon Short Line Railroad Co.*, 35 Utah 137, 99 P. 676, 20 L. R. A., N. S., 255, 18 Ann. Cas. 1159; *Goss* v. *Northern Pac. R. Co.*, 48 Or. 439, 87 P. 149.

It is argued that this was a private bridge, and Wade was a trespasser thereon. Of course the owner of a private bridge is under no obligation to keep the bridge in good and safe repair for use by the public at large, if he has given no invitation express or implied to use it. *Carson Lime Co.* v. *Rutherford*, 102 Va. 244, 46 S. E. 304. But such rule has no application in the case at bar. Here no attempt is made to hold the bridge owner to any liability for defects in the bridge, no claim is made that the Livestock Ass'n had or should have had, any knowledge that the bridge was unsafe. Both parties agree there was no evidence of any defects in the bridge until after it collapsed. The only question here is, assuming the bridge to have been as it appeared to be when Wade arrived there, was it negligence on his part to drive upon the bridge? What constitutes actionable negligence is the same as far as the user is concerned, whether the bridge be a public or a private one, subject only to the qualification above set out, that one may assume a public bridge sufficient under conditions which would require him to stop and examine a private bridge. This statement assumes one is not unlawfully attempting to use the bridge, and as pointed out supra, on the record before us, Wade's use of the bridge was a lawful use.

The argument is advanced that there were two other bridges Wade could have used. Had an examination of this bridge showed defects or raised doubt in Wade's mind as to the capacity of this bridge, the fact that there were other

available routes might enter into the question as to whether he was negligent in crossing this one. But since an examination was made, no defects appeared, and the conclusion of all was that the bridge would safely carry the load, the matter of alternate routes is immaterial. *Board of Com'rs of La Porte County* v. *Ellsworth*, 9 Ind. App. 566, 37 N. E. 22.

This action is one brought by the owner of the dominant estate for damages to the right of way, against one using the roadway by the approval and consent of the servient estate. This was an easement, or bridge and roadway, used by both the dominant and servient estate, according to the terms of the instrument of its creation. Where the easement is thus used, an equitable distribution of the burden of maintenance and repair must be made. *Lamb* v. *Lamb*, 177 N. C. 150, 98 S. E. 307; *Stevens* v. *Bird-Jex Co.*, 81 Utah 355, 18 P. 2d 292; *Bina* v. *Bina*, 213 Iowa 432, 239 N. W. 68, 78 A. L. R. 1216; *Schuricht* v. *Hammen*, 221 Mo. App. 389, 277 S. W. 944. It follows that the judgment should be reversed with costs to appellants.

TURNER, Justice (dissenting).

I concur with Mr. Chief Justice LARSON. The basis of the plaintiff's action, in negligence, in substance is that the defendant Wade knew or by exercise of reasonable care should have known that the bridge, by its construction, was not strong enough to support or sustain a truck with such a load; that the bridge was neither constructed or designed to carry heavy loads; that Wade failed to ascertain from plaintiff or its agents whether said bridge would support such a load.

The plaintiff has failed to support these allegations with the required proof. It is apparent that Wade did not know that the bridge would not support his load. He took the precaution to carefully examine the bridge from underneath. An employee of the plaintiff company and another accompanying Wade studied the bridge and all apparently

were of the opinion that the bridge was built so as to carry such a load.

There were no apparent defects. The bridge was of exceptionally heavy construction. Its streamers were 12 inches by 18 inches by 38 feet. The top was constructed of 2x6 inch plank. If there is any evidence in the record that this bridge was not constructed to carry a heavy truck loaded with ten tons, it is very meager and as presented deserves little consideration.

Under all the circumstances, I think Wade did everything required of him. He cannot be held for failing to discover the hidden defects in the bridge. These defects, I believe the evidence shows, were the cause of the bridge breaking.

WADE, J., having disqualified himself, did not participate herein.